**UNITED STATES of America, Petitioner-Appellant,**

v.

**A. L. BURBANK & CO., LTD., and Bank of Tokyo, Ltd., Respondents-Appellees,**

**and**

**Westward Shipping, Ltd., Intervenor-Cross-Appellant.**

Nos. 16, 68, 205, 207, Dockets 74–2342, 74–2359, 74–2470, 75–7186.

United States Court of Appeals, Second Circuit.

Argued Sept. 25, 1975.

Decided Oct. 22, 1975.

Ernest J. Brown, Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Paul J. Curran, U. S. Atty., S. D. N. Y., David P. Land, Walter S. Mack, Asst. U. S. Attys., Elmer J. Kelsey, David E. Carmack, Attys., Tax Div., Dept. of Justice, Washington, D. C.), for petitioner-appellant.

Victor J. Herwitz, New York City, for respondent-appellee A. L. Burbank & Co. (Sunao T. A. Yamada, New York City, for respondent-appellee Bank of Tokyo).

Louis Bender, New York City (Sandor Frankel, New York City, of counsel), for intervenor-cross-appellant.

Before MOORE, MULLIGAN and VAN GRAAFEILAND, Circuit Judges.

MULLIGAN, Circuit Judge:

The litigation giving rise to this appeal involves the construction of the Tax Treaty of 1942 ("the Treaty") between the United States and Canada, which provides for cooperation between the two countries in the exchange of information to aid each in conducting tax investigations. Essentially, we are called upon to determine whether the Treaty permits the United States Internal Revenue Service (IRS) to use the summons authority found in the 1954 Internal Revenue Code, 26 U.S.C. § 7602, to obtain information from American based corporations solely for a Canadian tax investigation where there is no United States interest in the investigation and no claim that United States income taxes are potentially due and owing. The case is one of first impression in this country. The United States District Court, Southern District of New York, Hon. Thomas P. Griesa, in an opinion dated July 31, 1974, held that IRS could not properly utilize its summons authority in this situation and denied the enforcement of the two IRS summonses at issue here. The United States has appealed. We find the appeal to be meritorious and reverse the order below. The court below also denied the application of the Canadian taxpayer, Westward Shipping, Ltd. (Westward), to intervene in the proceedings below. Westward has cross-appealed from this denial of intervention. We affirm the order from which the cross-appeal was taken.

I

The facts here are not in dispute. On November 23, 1971 the IRS issued an administrative summons to the Bank of Tokyo, New York branch (Bank of Tokyo), and on December 10, 1971 it issued a similar summons to A. L. Burbank & Co. (Burbank), also located in New York City. Both summonses sought to produce the books and records in the possession of the respective companies which were relevant to the potential tax liability of Westward, a Canadian corporation which is not a United States resident or taxpayer. The summonses were issued by IRS to obtain information which had been requested by Canadian tax authorities who were investigating Westward's possible liability for *Canadian* taxes. In December, 1971 counsel for Westward advised both Bank of Tokyo and Burbank not to comply with the summonses until written objections had been filed by Westward with IRS to contest the disclosure of information solely for the use of a foreign country. Westward filed such written objections with the New York IRS office on December 22, 1971 taking the position that the summonses were illegal, unenforceable and

not authorized either under the Code or the Treaty.

On November 14, 1972 IRS, which had not sought enforcement of the summonses, responded instead by issuing a new summons to Burbank which now purported to deal with *Burbank's* domestic tax liability, not Westward's. However it requested the same books and records as the earlier summons. Westward then moved to quash the second summons in the Southern District Court, claiming that it was a subterfuge to accomplish what the earlier and allegedly illegal summonses could not. This proceeding eventually led to a stipulation among the parties which provided for a stay of the summons until such time as the Government should move for its enforcement. The Government did not move to enforce but instead decided to enforce the original summonses in the instant proceeding, which it commenced on August 31, 1973. Both Burbank and the Bank of Tokyo agreed to take no position in the proceeding but Westward moved to intervene. During the proceeding before Judge Griesa the parties again entered into a stipulation whereby *inter alia* the United States withdrew any claim that IRS had any interest in the United States tax liabilities of Westward, and admitted that the Canadian authorities had requested the summonses solely because of a Canadian investigation of Canadian tax liabilities of Westward; Westward in turn agreed that it made no claim that the material sought to be obtained was irrelevant to the Canadian investigation.

Judge Griesa, after earlier intimations to the contrary, eventually advised Westward that it had no standing to intervene; Burbank and Bank of Tokyo at his suggestion then withdrew their agreement to take no position on the summonses and instead asserted their illegality. Judge Griesa's opinion and order of July 31, 1974 denied enforcement of the summonses and also denied Westward's motion to intervene.

## II

It is evident that the issue before us depends upon our construction of the Treaty and section 7602 of the Code. The opinion below properly observed that the Treaty provides no independent compulsory process but depended instead upon the provisions of the Code. Section 7602 [1] in relevant part authorizes the issuance of a summons and the production of books and records to determine the liability of any person "for any internal revenue tax". The court below concluded that this phrase should be construed to refer only to a tax liability under the *United States* internal revenue laws.

If the IRS has, or may obtain, information pursuant to a legitimate investigation of a party's United States tax liability, it may turn over such information to the Canadian government. But there is no authority either in the treaty or the statute for issuance of an

1. "§ 7602. Examination of books and witnesses

For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry."

IRS summons *solely* for the purpose of aiding Canadian tax authorities in a Canadian tax investigation.

Op. at 11 (emphasis in original).

We cannot read the statute this narrowly, particularly in view of the broad purposes of the Treaty.

Article XIX of the Treaty provides in pertinent part:

> With a view to the prevention of fiscal evasion, each of the contracting States undertakes to furnish to the other contracting State, as provided in the succeeding Articles of this Convention, the information which its competent authorities have at their disposal or are in a position to obtain under its revenue laws insofar as such information may be of use to the authorities of the other contracting State in the assessment of the taxes to which this Convention relates.

> The information to be furnished under the first paragraph of this Article, whether in the ordinary course or on request, may be exchanged directly between the competent authorities of the two contracting States.

Article XXI provides:

> 1. If the Minister in the determination of the income tax liability of any person under any of the revenue laws of Canada deems it necessary to secure the cooperation of the Commissioner, the Commissioner may, upon request, furnish the Minister such information bearing upon the matter as the Commissioner is entitled to obtain under the revenue laws of the United States of America.

> 2. If the Commissioner in the determination of the income tax liability of any person under any of the revenue laws of the United States of America deems it necessary to secure the cooperation of the Minister, the Minister may, upon request, furnish the Commissioner such information bearing upon the matter as the Minister is entitled to obtain under the revenue laws of Canada.

■ Our reading of the two articles of the Treaty set forth above (especially Article XIX) makes it abundantly clear that one purpose of the pact was to provide a means of cooperation between the contracting states whereby information could be exchanged after it was collected through the administrative processes provided by the statutory law of each. The avowed intent was to prevent fiscal evasion. Article XXI explicitly provides that if Canada desires information to determine the liability of any person under Canadian revenues laws, IRS may furnish the same information that it would be entitled to obtain under our Revenue Code. There is nothing in the Treaty to indicate that this procedure could only be applied in a case where there was concurrent tax liability in both states. If there were a tax evasion in either state the procedural tools of the "requested" state (i. e., the state asked to furnish information) were to be employed. It would totally frustrate the convention if we were now to hold that the examination process set forth in our Code is in any event unavailable because it can only be employed if there is an American tax liability. We think the fair reading of the Treaty is that if Canada is investigating the tax liability of one who is potentially delinquent to it, then the United States may utilize the same investigative techniques that it would employ if that person were under investigation here for a domestic tax liability. To do otherwise would negate the very purpose of the Treaty.

The court below construed section 7602 to apply the summons procedure only to the liabilities imposed by the United States Internal Revenue Code. This in our view is a narrow interpretation which would not only frustrate the Canadian Tax Treaty but also some eighteen other United States income tax conventions which have comparable exchange of information procedures.[2] It is

---

2. The other countries with which we have similar conventions are Australia, Austria, Belgium, Denmark, Finland, France, West Germany, Greece, Ireland, Italy, Japan, Nether-

natural that the Internal Revenue Code refers in section 7602 to liabilities under United States law, since it was written as a United States tax law, but to read it to exclude the use of the very procedures to which the Treaty refers not only thwarts the purpose of the Treaty but also ignores well settled rules of construction.

■■ Upon its ratification the Treaty became part of our law, *Bacardi Corp. v. Domenech,* 311 U.S. 150, 161, 61 S.Ct. 219, 85 L.Ed. 98 (1940). Moreover it is well understood that treaties are to be broadly construed to enable the intent of the treaty to be enforced.

> According to the accepted canon, we should construe the treaty liberally to give effect to the purpose which animates it. Even where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred.

*Bacardi Corp. v. Domenech, supra,* 311 U.S. at 163, 61 S.Ct. at 225.

> Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred.

*Factor v. Laubenheimer,* 290 U.S. 276, 293–94, 54 S.Ct. 191, 78 L.Ed. 315 (1933). Accord, *Jhirad v. Ferrandina,* 355 F.Supp. 1155, 1160 (S.D.N.Y.) rev'd on other grounds, 486 F.2d 442 (2d Cir. 1973).

■ Aside from general principles of construction, section 7852(d) of the 1954 Code, which was enacted after the Treaty in question, provides:

> No provision of this title shall apply in any case where its application would be contrary to any treaty obligation of the United States in effect on the date of enactment of this title.

Thus even if section 7602 were read as narrowly as the court below did, it would be contrary to the Treaty and therefore not enforceable.

The only authorities cited by the appellees here to support the proposition that the compulsory process provided in section 7602 is limited to a case involving an investigation of delinquent United States taxes, *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); *SEC v. Wall St. Transcript Corp.,* 422 F.2d 1371 (2d Cir. 1970); *United States v. Harrington,* 388 F.2d 520 (2d Cir. 1968) all involve domestic taxpayers and do not involve the articles of the Treaty at issue or any comparable pact. They are not in point here; as we indicated at the outset, the question before us is one of first impression.

### III

■ The appellees urge that the practical construction of the Treaty by the contracting states must be given great weight in its interpretation. *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961). Appellees emphasize that IRS has promulgated an Internal Revenue Manual, section 9265.2(3) of which directs special agents, in making requests to Canada to obtain information relevant to United States tax evasion, to "[p]rovide adequate background to support a Canadian Tax interest, because *Canadian tax authorities* are authorized to furnish only that information which they can obtain under the revenue laws of Canada" (emphasis added).

lands, New Zealand, Norway, Pakistan, Sweden, Trinidad and Tobago, and South Africa. Of course, we are not now called upon to construe these other conventions, but note that they have never been interpreted to our knowledge to eliminate the section 7602 summons power in cases where the tax investigation was unilateral.

The Government concedes that this represents IRS's understanding of the Canadian position as the result of conversations between IRS representatives and the Canadian Ministry of National Revenue between 1960 and 1962. There is nothing in the record however to establish that this is the official Canadian construction of the Treaty but even on the assumption that it is, we do not consider it fatal to appellant's position here. It may represent the Canadian view but it does not represent the *American* interpretation. The Government states that the position it takes here, which has been approved by the Office of the Legal Adviser, Department of State, and the Office of International Tax Counsel, Treasury Department, constitutes the interpretation of the Treaty which the United States has consistently maintained. The Government argues that there has been no prior litigation on this point precisely because that position has not been challenged before. Although the appellees are skeptical we see nothing in the record which would contradict this representation made by the Government in its brief and emphasized on the oral argument below.

Appellees argue however that even if the Manual interpretation represents just the Canadian position, if the Treaty purpose was to provide the exchange of information on a reciprocal basis, then the United States should not now be under any greater obligation to furnish information than is the Canadian Government. This contention is at odds with the holding in *Charlton v. Kelly,* 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274, (1913). That case involved the extradition by Italy from the United States of an American fugitive who allegedly committed a murder in Italy. The United States had interpreted the word "person" of the applicable extradition treaty with Italy to include all persons who had committed crimes in Italy, including citizens of the United States. Italy on the other hand had refused to surrender its nationals who had committed crimes in the United States. The Court held that although the obligation had ceased to be reciprocal, the United States had the option either to renounce the treaty or to conform to its own obligation as it had construed it. "If the attitude of Italy was, as contended, a violation of the obligation of the treaty, which, in international law, would have justified the United States in denouncing the treaty as no longer obligatory, it did not automatically have that effect." 229 U.S. at 473, 33 S.Ct. at 954.[3] As the Court stated in *Factor v. Laubenheimer, supra,* 290 U.S. at 298, 54 S.Ct. at 197: "Until a treaty has been denounced, it is the duty of both the government and the courts to sanction the performance of the obligations reciprocal to the rights which the treaty declares and the government asserts, even though the other party to it holds to a different view of its meaning." We conclude then that the Canadian interpretation, even if it be at odds with that of the United States, is not relevant here.

Appellees further point out that both the United States and Canada are members of the Organization for Economic Co-Operation and Development (OECD), established in Paris in December, 1960. The OECD Model Treaty contains an Article 26, entitled "Exchange of Information," which in its paragraph 2[4] and in

---

**3.** To circumvent *Charlton,* appellee relied on oral argument upon *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936). We find nothing there which contradicts the holding of *Charlton v. Kelly.* The extradition treaty in *Valentine* contained the explicit provision that "[n]either of the contracting Parties shall be bound to deliver up its own citizens," 299 U.S. at 10, 57 S.Ct. at 103. The Court therefore found no authority in any statute or in the Treaty to authorize a surrender of the *Valentine* respondents.

**4.** "2. In no case shall the provisions of paragraph 1 be construed so as to impose on one of the Contracting States the obligation:

   a) to carry out administrative measures at variance with the laws or the administrative practice of that or of the other Contracting State;

   b) to supply particulars which are not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State;

the Commentary thereto states in substance that no contracting state is to supply to another particulars not obtainable under its laws or in the normal course of the administrative practice of that or the other contracting state. Appellees argue that because the United States and Canada have not amended the bilateral Treaty in question since the passage of the Model Treaty, both must interpret it consistently with the Model Treaty. However, as the Government points out, the Model Treaty's Revised Commentary of January, 1975, ¶¶ 12 and 14, now states:

12. This paragraph (Paragraph 2 of the Model Treaty) embodies certain limitations to the main rule in favor of the requested State. In the first place, the paragraph contains the clarification that a Contracting State is not bound to go beyond its own internal laws and administrative practice in putting information at the disposal of the other Contracting State. *However, types of administrative measures authorized for the purpose of the requested State's tax must be utilized even though invoked solely to provide information to the other Contracting State.* Likewise, internal provisions concerning tax secrecy should not be interpreted as constituting an obstacle to the exchange of information under the present Article. As mentioned

above, the authorities of the requesting State are obliged to observe secrecy with regard to information received under this Article. (Emphasis supplied.)

14. Information is deemed to be obtainable in the normal course of administration if it is in the possession of the tax authorities or can be obtained by them in the normal procedure of tax determination, *which may include special investigations or special examination of the business accounts kept by the taxpayer or other persons provided the tax authorities would make similar investigations or examination for their own purposes. This means that the requested State has to collect the information the other State needs in the same way as if its own taxation was involved,* under the proviso mentioned in paragraph 13 above. (Emphasis supplied.)

The appellees urge that the United States intent was to adapt American treaty provisions to those in the Model OECD convention.[5] Assuming this to be true, appellees can find no solace; in fact the new Commentary[6] reinforces the Government's position, which we have adopted here, that American administrative procedures (which include the administrative summonses in issue here) are properly utilized where the purpose is solely to assist the investiga-

c) to supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process, or information, the disclosure of which would be contrary to public policy (ordre public)."

5. See the remarks of former Assistant Secretary of the Treasury Stanley Surrey, in Factors affecting United States treasury in conducting international tax treaties, 28 J. Taxation 277 (1968). However, in this article Prof. Surrey does not touch at all upon the exchange-of-information aspect of tax treaties.

6. At oral argument counsel for appellees attempted to answer the Revised Commentary by citing its paragraph 13, which says:

Furthermore the requested State does not need to go so far as to carry out administrative measures that are not permitted under

the laws or practice of the requesting State or to supply items of information that are not obtainable under the laws or in the normal course of administration of the requesting State. It follows that a Contracting State cannot take advantage of the information system of the other Contracting State if it is wider than its own system.

However, we think the word "wider" here refers merely to the internal information-gathering procedures used by each signatory, and does not mean, as appellee would have it, that the requested party cannot be asked to do for the requesting party what the latter would not do for it. Furthermore, paragraphs 12 and 14, quoted in the text, make it quite clear that the Model Treaty contemplates the requested country gathering and furnishing information to the requester even though the former has no use for the information itself.

tion of a Canadian potential tax liability.[7]

■ Finally, we affirm Judge Griesa's order denying Westward the right to intervene. We have held squarely that "[t]he taxpayer, under circumstances where only books, records and other papers belonging to [a] third party are the subject of the summons, has no standing to object to the summons." *Application of Cole,* 342 F.2d 5, 8 (2d Cir.), cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965). See also *Fifth Avenue Peace Parade Comm. v. Gray,* 480 F.2d 326, 332 (2d Cir. 1973). Our holding in *Cole* was cited with approval in *Donaldson v. United States,* 400 U.S. 517, 530, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). In any event, Westward was not prejudiced by the denial of intervention here, as its counsel admitted on argument of this appeal; it has been allowed to argue its cross-appeal and both Bank of Tokyo and Burbank have adopted its brief.

Affirmed in part and reversed in part.

---

**7.** Both sides further urge on us certain portions of the "legislative history" of the Treaty, which supposedly clarifies the congressional intent. For example, the Government cites a letter from the then-Acting Secretary of State which accompanied the Treaty when it was presented to Congress for ratification; the letter notes that the Treaty was to provide information to each signatory "upon a reciprocal basis," such information to include data about United States taxpayers which is "available in Canada," without mention of a requirement of a concurrent tax investigation in Canada. 1 Leg.Hist. of U.S. Tax Conv. 446, 449 (1962). In the same letter we find the assertion that "the articles of the [Treaty] are in accord with existing revenue laws of the United States . . . ." Id. at 447. Section 7602's predecessors (§§ 3614 and 3615 of the Internal Revenue Code of 1939) were part of the "existing revenue laws of the United States" at the time of the Treaty's ratification; therefore the Acting Secretary's letter would indicate no conflict between the Treaty and the summons provisions of the Code.

Appellee invokes a discussion in Congress during which then-Senator George of Georgia expressed the following opinion: "I do not think there is anything in the convention which would require furnishing information beyond what each Government has the right to ask of its own citizens at the present time.

. . . The convention does not undertake to confer upon either the United States or Canada any extra power with respect to inquiries made of the citizens of either country." 88 Cong.Rec. 4714 (1942). However, this is inconclusive: certainly the section 7602 summons power is a "power" the United States can levy on its own citizens; the question is whether it can do so when the only tax investigation is in Canada, and Sen. George's remarks shed no light on that question.

Finally, the Senate floor debate including the following opinion of then-Senator Taft of Ohio:

In other words, if an American citizen were using a Canadian bank deposit to evade income taxation, I think the [Treaty] would permit the United States Government to ask the Canadian Government to obtain information from its own bank and furnish it to this Government in connection with the enforcement of out internal-revenue laws.

Mr. George. It does provide for exchange of information, as the Senator from Ohio points out.

Mr. Taft. But no general information of that kind would be requested except perhaps in specific cases in which inquiry was being made relative to income-tax evasion.

Id. these remarks would seem to support the appellant's interpretation of the Treaty.