United States Court of Appeals,

Fifth Circuit.

No. 93-7447.

Julio Roberto Zarate BARQUERO, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Counter-Claimant-Appellee,

v.

INTERNATIONAL BANK OF COMMERCE, Counter-Defendant-Appellant.

April 20, 1994.

Appeal from the United States District Court for the Southern District of Texas.

Before HENDERSON,[*] SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Plaintiff Julio Roberto Zarate Barquero ("Zarate") and Counter-defendant International Bank of Commerce ("IBC") appeal the district court's order denying their motion to quash an administrative summons issued by the Internal Revenue Service ("IRS") and granting the government's motion to enforce the summons. We affirm.

I

In 1989, the United States and Mexico signed a Tax Information Exchange Agreement ("TIEA").[1] In 1991, the "competent authority"

_____

[*]Circuit Judge of the 11th Circuit, sitting by designation.

[1]As its name suggests, a TIEA is an agreement providing for the exchange between two countries of tax or tax-related information that may otherwise be subject to nondisclosure laws of each country. 26 U.S.C. § 274(h)(6)(C)(i). A TIEA allows both countries to obtain from each other information that "may be necessary or appropriate to carry out and enforce the[ir] tax

of Mexico requested pursuant to the TIEA that the IRS[2] provide information regarding Zarate's tax liability under the laws of Mexico. Pursuant to that request, the IRS served IBC with an administrative summons requesting all records in IBC's possession pertaining to bank accounts held or controlled by Zarate. Zarate filed a petition with the district court to quash the summons, which the government answered. The government also filed a counterclaim seeking to enforce the summons and adding IBC as a defendant. Both parties then sought summary judgment. After a hearing, the district court denied the motion to quash and granted the motion to enforce. Zarate and IBC now appeal, arguing that the district court erred in several respects.

## II

Zarate initially contends that the United States—Mexico TIEA is unconstitutional because Congress has not authorized the President to enter into such agreements. Section 274(h)(6)(C) of the Internal Revenue Code authorizes the Secretary "to negotiate and conclude an agreement for the exchange of information with any beneficiary country." 26 U.S.C. § 274(h)(6)(C). It is undisputed that Mexico is *not* a "beneficiary country" as that term is defined by section 212(a)(1)(A) of the Caribbean Basin Economic Recovery

---

laws." *Id.*

[2]Pursuant to a delegation from the Secretary of the Treasury, the IRS is the "competent authority" of the United States. The TIEA charges the competent authorities of each country with carrying out all exchanges of information between the two countries.

Act—19 U.S.C. § 2702.[3]  *See* 26 U.S.C. § 274(h)(6)(B).  Zarate thus concludes that the TIEA between the United States and Mexico is unconstitutional because the President lacked the authority to enter into it.

The government, on the other hand, argues that the 1986 amendments to the Code provided statutory authorization for the U.S.—Mexico TIEA.[4]  Specifically, the government points to § 927(e)(3) of the Code, which provides that

> the term ["foreign sales corporation" ("FSC") ] shall not include any corporation which was created or organized under the laws of any foreign country unless there is in effect between such country and the United States—
>
> (A) a bilateral or multilateral agreement *described in section 274(h)(6)(C)* (*determined by treating any reference to a beneficiary country as being a reference to any foreign country* and by applying such section without regard to clause (ii) thereof)[5]....

---

[3]The Caribbean Basin Economic Recovery Act is also known as the Caribbean Basin Initiative ("CBI").  Beneficiary countries that enter into TIEAs with the United States gain several benefits, the most notable being that they become eligible for project financing under § 936 of the Code.

[4]The government did not argue in its brief that the President, pursuant to his own constitutional authority, could lawfully enter into the TIEA.

[5]Clause (ii) of § 274(h)(6)(C) provides:

> An exchange of information agreement need not provide for the exchange of qualified confidential information which is sought only for civil tax purposes if—
>
> (I) the Secretary of the Treasury, after making all reasonable efforts to negotiate an agreement which includes the exchange of such information, determines that such an agreement cannot be negotiated but that the agreement which was negotiated will significantly assist in the administration and enforcement of the tax laws of the United States, and

26 U.S.C. § 927(e)(3) (emphasis added).  While acknowledging that Congress did not explicitly amend § 274(h)(6)(C) by amending § 927(e)(3), the government nonetheless contends that § 927(e)(3) authorizes the President to enter into TIEAs with non-beneficiary countries.  We agree.

Prior to 1986, only beneficiary countries that had entered into TIEAs with the United States could serve as host countries for FSCs.[6]  However, Congress, through the 1986 amendments, opted to allow any foreign country to enter into a TIEA and become eligible to be a host country:

> The 1986 [Tax Reform] Act provided that a country may qualify as a host country for foreign sales corporations (FSCs) by entering into an exchange of information agreement of the type provided for in the Caribbean Basin Economic Recovery Act, *whether or not that country is eligible to be a CBI beneficiary country.... [W]here a country other than a CBI beneficiary country enters into a bilateral information exchange agreement* of the type that qualifies it as a FSC host country ..., the bill provides express protection to individuals who make disclosures in accordance with the terms of the agreement from Code sanctions for unauthorized disclosures.

S.Rep. No. 445, 100th Cong., 2d Sess. 332 (1988), U.S.Code Cong. & Admin.News 1988, pp. 4515, 4843-4844 (emphasis added).[7]  If the Executive lacked the power to enter into TIEAs with non-beneficiary countries, the 1986 amendment to § 927(e)(3) would serve no

---

(II) the President determines that the agreement as negotiated is in the national security interest of the United States.

26 U.S.C. § 274(h)(6)(C)(ii).

[6]*See* 26 U.S.C. § 927(e)(3) (1982).

[7]The report was promulgated in 1988 when Congress corrected technical errors in the 1986 Tax Reform Act.

apparent purpose—an absurd result.[8]  Thus, we believe that §§

274(h)(6)(C) and 927(e)(3), when read together, provide specific

congressional authorization for the President's decision to enter

into the challenged TIEA.[9]  Consequently, the TIEA "is "supported

by the strongest of presumptions and the widest latitude of

judicial interpretation, and the burden of persuasion would rest

heavily upon any who might attack it.' " *Dames & Moore v. Regan,*

453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (quoting

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637, 72 S.Ct.

863, 871, 96 L.Ed.2d 1153 (1952) (Jackson, J., concurring)).

"Under the circumstances of this case, we cannot say that [Zarate]

has sustained that heavy burden." *Id.*  Accordingly, we find that

the U.S.—Mexico TIEA is both constitutional and valid.[10]

Although we conclude that §§ 274(h)(6)(C) and 927(e)(3)

constitute specific congressional authorization to the President to

_____

[8]Zarate argues that the 1986 amendment to § 927(e)(3)
"merely provides that if the Secretary did enter into [TIEAs with
non-beneficiary countries], the foreign countries who are party
to those agreements could qualify as a host country [sic] for
FSCs."  In Zarate's opinion, before the Secretary actually could
enter into a TIEA with a non-beneficiary country, Congress would
need to pass a statute specifically authorizing the proposed
TIEA.  We disagree.  Section 927(e)(3)'s cross-reference to and
incorporation of § 274(h)(6)(C) and redefinition of the term
"beneficiary country" demonstrates Congress's intent to authorize
the Secretary to negotiate and conclude a TIEA with "any foreign
country."  26 U.S.C. § 927(e)(3)(A).

[9]*See* State Dept. Rel. No. 90-85 (noting that the TIEA at
issue "was concluded pursuant to section 274(h)(6)(C) of the
Code, which is incorporated by reference and implication in
section 936(d) of the Code, as amended by ... the Tax Reform Act
of 1986").

[10]This, of course, does not mean that every cross-reference
in the Code incorporates and amends the referenced provision.

enter into the TIEA at issue, we alternatively find that these sections of the Code provide "implicit approval" for the President's actions.[11]  The Supreme Court has noted that a "failure of Congress specifically to delegate authority does not, "especially ... in the area[ ] of foreign policy ...,' imply "congressional disapproval' of the action taken by the Executive." *Dames & Moore,* 453 U.S. at 678, 101 S.Ct. at 2986 (quoting *Haig v. Agee,* 453 U.S. 280, 291, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981)) (some alterations in original).  Instead,

> the enactment of legislation closely related to the question of the President's authority in a particular case which evinces legislative intent to accord the President broad discretion may be considered to "invite" "measures on independent presidential responsibility." At least this is so where there is no contrary indication of legislative intent and when ... there is a history of congressional acquiescence in conduct of the sort engaged in by the President.

*Id.* at 678-79, 101 S.Ct. at 2986 (quoting *Youngstown,* 343 U.S. at 637, 72 S.Ct. 871 (Jackson, J., concurring)).  Here, the 1986 amendment to § 927(e)(3) constitutes an "invitation" for the President to enter into TIEAs with non-beneficiary countries.[12] *Cf. id.* at 680, 101 S.Ct. at 2987 ("By creating a procedure to implement future settlement agreements, Congress placed its stamp of approval on such agreements.").  Moreover, there exists a

---

[11]*See* Restatement (Third) of Foreign Relations Law of the United States § 303 cmt. e (stating that "Congress may enact legislation that requires, *or fairly implies,* the need for an agreement") (emphasis added).

[12]*See also* 26 U.S.C. § 6103(k) ("A return or return information may be disclosed to a competent authority of a foreign government which has ... [a] convention or bilateral agreement relating to the exchange of tax information[ ] with the United States....").

6

history, albeit a short one, of congressional acquiescence in the President's concluding TIEAs with non-beneficiary countries, and Congress has not questioned the power of the President to conclude such agreements.[13]  Indeed, the Senate appears to have given its explicit approval to the TIEA at issue when it ratified the United States–Mexico comprehensive income tax convention in November 1993.[14]  Consequently, we believe that the Executive did not exceed its power by entering into the TIEA with Mexico.

### III

Zarate next argues that even if the TIEA is valid, the IRS lacks the authority to issue a summons on behalf of a request by

---

[13]In addition to the U.S.–Mexico agreement, the President has signed TIEAs with Columbia and Peru, both non-beneficiary countries, without any indication of congressional disapproval. *See* Financial Times, Oct. 1993, available in LEXIS, Nexis Library (IRS announces the signing of a TIEA with Columbia);  *U.S. Signs Anti-Drug Pacts with Bolivia and Peru,* Reuters, February 1990, available in LEXIS, Nexis Library.  At one time, the President also was actively negotiating with Bolivia regarding the possibility of entering into a TIEA.  *See Treasury Department Announcement of Status of Negotiations of Income Tax Treaties and Tax Information Exchange Agreements,* Daily Report for Executives, April 5, 1993, available in LEXIS, Nexis Library.

[14]In September 1992, the United States and Mexico signed a comprehensive income tax convention.  Article 27 of the convention states that "[t]he competent authorities [of both countries] shall exchange information as provided in the Agreement Between the United States of America and the United Mexican States for the Exchange of Information with Respect to Taxes signed on November 9, 1989."  Convention Between the Government of the United States of America and the Government of the United Mexican States for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, September 18, 1992, U.S.–Mex., art. 27, S. Treaty Doc. No. 7, 103d Cong., 1st Sess. 52 (1993).  The President transmitted the convention to the Senate in May 1993, and the Senate advised and consented to the ratification of the convention on November 20, 1993.  *See* 139 Cong.Rec. S16857-01 (daily ed. Nov. 20, 1993).

Mexico pursuant to the TIEA.  The IRS contends that it may use the powers and authority granted to it under chapter 78 of the Code, 26 U.S.C. § 7601 *et seq.,* to obtain information and documents requested by the competent authority of a country that has a TIEA with the United States.  *See United States v. Stuart,* 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (upholding administrative summons issued by IRS pursuant to a request by Canada, which had a tax convention with the United States providing for the exchange of tax information between the countries).

Section 274(h)(6)(D) of the Code provides that the Secretary "may exercise his authority under subchapter A of chapter 78 to carry out any obligation of the United States under an [exchange of information] agreement referred to in [§ 274(h)(6)(C) ]."   26 U.S.C. § 274(h)(6)(D).  Here, the TIEA with Mexico states:

> If information is requested by a Contracting State pursuant to paragraph 4, the requested State shall obtain the information requested in the same manner, and provide it in the same form, as if the tax of the applicant State were the tax of the requested State and were being imposed by the requested State.

Thus, the TIEA obliges the IRS to seek documents from IBC as if the IRS was determining Zarate's American tax liability.  Moreover, the TIEA is, pursuant to the cross-reference found in § 927(e)(3)(A), negotiated under § 274(h)(6)(C).  Thus, the TIEA obliges the IRS to use its authority under chapter 78 of the Code to obtain the information and documents sought by the Mexican tax authorities. Chapter 78 authorizes the IRS to summon any person the Secretary deems proper "to produce such books, papers, records, or other data ... as may be relevant to" "ascertaining the correctness of any

8

return, making a return where none has been made, determining the liability of any person for any internal revenue tax ..., or collecting any such liability." 26 U.S.C. § 7602(a)(2). Accordingly, the IRS possessed the authority to issue the summons on behalf of the competent authority of Mexico.

IV

Zarate next complains that the district court erred in enforcing the summons because the IRS issued it in bad faith. To obtain enforcement of an administrative summons, the IRS must demonstrate that it issued the summons in good faith—i.e.,

> that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed—in particular, that the [IRS], after investigation, has determined the further examination to be necessary and has notified the taxpayer in writing to that effect.

*United States v. Powell,* 379 U.S. 48, 57-58, 85 S.Ct. 248, 254-55, 13 L.Ed.2d 112 (1964). Once the IRS has made such a showing, "it is entitled to an enforcement order unless the taxpayer can show that the IRS is attempting to abuse the court's process." *Stuart,* 489 U.S. at 360, 109 S.Ct. at 1188.

The affidavits the IRS submitted in this case "plainly satisfied the requirements of good faith [the Supreme Court] set forth in *Powell.*" *Id.,* 489 U.S. at 360, 109 S.Ct. at 1188; *see also id.* at 370, 109 S.Ct. at 1193 (noting that the summons will be enforced "[s]o long as *the IRS itself* acts in good faith") (emphasis added). The IRS Assistant Commissioner (International) stated under oath that the information sought was not within the

9

possession of American or Mexican tax authorities, that it might be relevant to the determination of Zarate's Mexican tax liabilities, that the same type of information could be obtained by Mexican tax authorities under Mexican law, and that Mexican tax authorities had requested that the IRS seek such information. She further noted that any exchanged information could be disclosed only "as required in the normal administrative or judicial process operative in the administration of the tax system" in Mexico and that improper use of exchanged information would be protested. Moreover, the IRS issued the summons in conformity with applicable statutes[15] and duly informed Zarate by certified or registered mail of its issuance. Finally, Zarate has failed to adduce any facts indicating that the IRS was trying to use the district court's process for some improper purpose, "such as harassment or the acquisition of bargaining power in connection with some collateral dispute." *Id.* at 360-61, 109 S.Ct. at 1188. Accordingly, the IRS was entitled to

_____

[15]Zarate, without citing any authority, complains that the IRS did not issue the summons in conformity with applicable statutes because the TIEA was not published in "a compilation entitled "United States Treaties and Other International Agreements,' " 1 U.S.C. § 112a, and was not transmitted to Congress within sixty days after the TIEA "entered into force," 1 U.S.C. § 112b. However, Zarate did not contend before the district court that these facts demonstrated that the IRS issued the summons in bad faith. Accordingly, we need not address these issues. *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1163 (5th Cir.1992) (noting that we need not consider issues raised on appeal if they were not raised before the district court). While Zarate did raise these issues below regarding the validity of the TIEA, he does not argue on appeal that the TIEA is unconstitutional or invalid for these reasons. *See United States v. Valdiosera-Godinez,* 932 F.2d 1093, 1099 (5th Cir.1991) ("Any issues not raised or argued in the appellant's brief are considered waived and will not be entertained on appeal."), *cert. denied,* --- U.S. ----, 113 S.Ct. 2369, 124 L.Ed.2d 275 (1993).

an enforcement order. *See id.* (where the Supreme Court upheld IRS summonses issued on behalf of Canada where the supporting affidavits were virtually identical to the supporting affidavits supplied here); *United States v. Linsteadt,* 724 F.2d 480, 482 (5th Cir.1984) (noting that "the requisite showing [of relevance] may be made by a simple affidavit filed with the petition to enforce by the agent who issued the summons").

V

Zarate next argues that because the IRS failed to comply with the Right to Financial Privacy Act ("RFPA") when issuing the summons to IBC, the summons is unenforceable. Zarate points out that Article 4(4)(b) of the TIEA specifically imposes upon the IRS the duty to comply with the RFPA when seeking information on behalf of the Mexican government:

> If the United States is requested to obtain the types of information covered by section 3402 of the Right to Financial Privacy Act of 1978 [12 U.S.C. § 3402] as in effect at the time of signing this agreement, it shall obtain the requested information pursuant to that provision.

Thus, the plain language of the TIEA requires the IRS to comply with § 3402 of RFPA. *See Stuart,* 489 U.S. at 365, 109 S.Ct. at 1191 (noting that the clear import of treaty language controls). Section 3402 provides that the government may not obtain from any financial institution the financial records of any person, "except as provided by section ... 3413" of the RFPA. Section 3413, in turn, provides that "[n]othing in [the RFPA] prohibits the disclosure of financial records in accordance with procedures authorized by Title 26." Because Zarate does not argue that the

11

summons failed to comply with the examination and inspection procedures set out in Title 26, *see* 26 U.S.C. § 7601 *et seq.,* we find that the IRS issued the summons in compliance with both § 3402 of the RFPA and Article 4 of the TIEA.

VI

Zarate, again without citing any authority, contends that the summons is unenforceable to the extent the IRS seeks to obtain documents created before the TIEA took effect.  The government, on the other hand, argues that "information may be requested and provided for tax periods prior to the effective date of the TIEA."

Initially, we note that "the Supreme Court has consistently declined to circumscribe the breadth of the summons authority that Congress intended to grant the IRS, absent unambiguous directions from Congress." *United States v. Barrett,* 837 F.2d 1341, 1349 (5th Cir.1988) (en banc), *cert. denied,* 492 U.S. 926, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989).  For example, the Court has refused to read into the Code requirements that summons, to be enforceable, be founded upon probable cause, *Powell,* 379 U.S. at 53-54, 85 S.Ct. at 253, that the summons authority be limited to case where no criminal prosecution was pending, *Donaldson v. United States,* 400 U.S. 517, 533, 91 S.Ct. 534, 544, 27 L.Ed.2d 580 (1971), and that the IRS did not have the authority to issue "John Doe" summonses to determine the identity of unknown individuals who might be liable for unpaid taxes, *United States v. Bisceglia,* 420 U.S. 141, 150, 95 S.Ct. 915, 921, 43 L.Ed.2d 88 (1975).  Moreover, it is clear that an IRS summons can require the production of records for years that

12

are time-barred from investigation so long as the material from those years is relevant for the years under investigation that are not time-barred. *Dunn v. Ross,* 356 F.2d 664, 666 (5th Cir.1966). Furthermore, "the evident purpose behind [the TIEA]—the reduction of tax evasion by allowing signatories to demand information from each other—counsels against interpreting [the agreement] to limit inquiry in the manner [Zarate] desire[s]." *Stuart,* 489 U.S. at 368, 109 S.Ct. at 1192. Accordingly, because neither the TIEA nor Congress circumscribes the breadth of the summons authority that Congress granted the IRS, we find that the IRS may use that authority to obtain documents generated before the TIEA went into effect.

## VII

Zarate's final contention is that the summons—by requesting "[a]ll records in [IBC's] possession, custody, or control relative to all accounts ... held or controlled by or on behalf of Julio Roberto Zarate Barquero"—is overbroad because it does not identify with "reasonable particularity" the documents that IBC is to produce. "An overbreadth summons ... is simply a summons which does not advise the summoned party what is required of him with sufficient specificity to permit him to respond adequately to the summons." *United States v. Wyatt,* 637 F.2d 293, 302 n. 16 (5th Cir.1981). Because the summons identified with sufficient specificity the actions required of IBC in responding to the summons—IBC had to produce all records in its possession that pertained to IBC accounts held by Zarate—we uphold the district

13

court's finding that the summons was not overbroad.  *See Linsteadt,* 724 F.2d at 483.

In arguing that the summons was overbroad, Zarate appears to argue that the summons seeks information and documents irrelevant to the determination of his Mexican tax liability, although he confuses the concept of overbreadth with that of relevance.  *See Wyatt,* 637 F.2d at 301 (noting that "overbreadth and relevance are two separate inquiries").[16]  As we already have determined that the information sought is relevant to the determination of Zarate's Mexican tax liabilities, *see* part IV *supra,* we reject Zarate's argument that it is not.[17]

## VIII

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[16]We note that neither Zarate nor IBC argued that the summons was overly burdensome.  *See Wyatt,* 637 F.2d at 302 n. 16 (noting that the concept of burdensome is distinct from the concept of overbreadth).

[17]Zarate further argues that the district court erred both by examining *in camera* the Mexican competent authority's request that the IRS obtain the information at issue and a letter from Mexican authorities demonstrating that their investigation into Zarate's tax liability was not barred by any Mexican statute of limitations and by denying Zarate the opportunity to conduct discovery.  However, "the method and scope of discovery allowed in summons enforcement proceedings are committed in large part to the discretion of the district court." *United States v. Johnson,* 652 F.2d 475, 476 (5th Cir.1981).  Here, the challenged actions do not constitute an abuse its discretion by the district court. *See id.;  cf. Barrett,* 837 F.2d at 1349 (noting that summons enforcement "proceedings are intended to be summary in nature").