LIDAS, INC., a Delaware corporation; David Chelala; Liliane Chelala, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

No. 99–55692.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 2000

Filed Feb. 5, 2001

Edward O.C. Ord, Ord & Norman, San Francisco, California, for the appellants.

James P. Springer (argued), Robert E. Lindsay, Alan Hechtkopf, William A. Whitledge, Tax Division, U.S. Department of Justice, Washington, D.C., for the Appellee.

Before: O'SCANNLAIN, FERNANDEZ and RAWLINSON, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether an Internal Revenue Service summons issued at the request of French tax authorities under the terms of the United States–France Income Tax Treaty may be enforced in federal court.

I

Appellants Lidas, Inc. ("Lidas") and David and Liliane Chelala (the "Chelalas") appeal the district court's dismissal on summary judgment of their complaint to quash, and its order summarily enforcing, an Internal Revenue Service ("IRS") summons issued at the request of French tax authorities pursuant to Article 27 of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, Aug. 31, 1994, U.S.-Fr., S. Treaty Doc. No. 103–32 (the "Treaty"). Article 27 provides for the exchange of information between the tax authorities of the two nations. The Chelalas are citizens of France who permanently reside in the

Congo and are the sole ultimate shareholders of Lidas.

On May 14, 1998, the IRS served a summons on Mitsui Manufacturers Bank for bank records relating to a French tax investigation of the Chelalas. On the same day, the IRS served notice of the summons on the Chelalas by sending them a copy by registered mail to an address in Nice, France provided to the IRS by French authorities. The IRS also sent the Chelalas a copy of the summons to an address in Lebanon that Thomas J. Rossitto, a longtime tax representative for Lidas, provided to the IRS on a Form 2848 (Power of Attorney) signed by the Chelalas themselves. In addition, the IRS sent copies of the summons to Lidas in Los Angeles and to Rossitto himself. Although the IRS was apparently notified a number of times that the Congo was the Chelalas' "tax home," it was not provided a specific Congo address for the Chelalas until June 15, 1998, the day the Bank was to appear before the IRS. As a result, the IRS never mailed a copy of the summons to the Chelalas' Congo address.

On June 3, 1998, the Chelalas filed a complaint under 26 U.S.C. § 7609(b)(2) to quash the summons, arguing, *inter alia,* that the Treaty was constitutionally void; that issuance of the summons violated various provisions of the Internal Revenue Code; that summary enforcement of the summons was improper; and that they did not receive notice of the summons in the manner required by 26 U.S.C. § 7609, the due process clause of the Fifth Amendment, or the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 ("Hague Service Convention"). The United States moved to dismiss the complaint and to enforce the summons. On February 8, 1999, the District Court granted the United States summary judgment but stayed enforcement of the summons pending this appeal.

## II

The United States—France Income Tax treaty was signed by the President in 1994 and ratified by the Senate in 1995 pursuant to the treaty clause, art. II, § 2, cl. 2 of the Constitution. As its formal title illustrates, the Treaty's objectives are two-fold: the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income and capital. Articles 1–26 and 29–34 of the Treaty relate to the first purpose, avoidance of double taxation, and contain provisions reducing or eliminating the tax liabilities of certain individuals who are domiciled in one of the contracting nations and who derive income from activities in the other. Articles 27 and 28 relate to the second purpose, the prevention of tax evasion, and provide for the exchange of information between the tax authorities of the two nations. The IRS summons in dispute here was issued pursuant to article 27.

According to the Chelalas, because the Treaty contains provisions purporting to alter the Internal Revenue Code-namely, those relating to the avoidance of double taxation-the Treaty as a whole infringes on Congress's power to law and collect taxes under art. I, § 8, cl. 1 of the Constitution as well as the House's exclusive power to originate all bills for raising revenue under the origination clause of the Constitution, art. I, § 7, cl. 1. As a result, the Treaty exceeds the lawful scope of the treaty power and requires the legislative approval of both houses of Congress before taking effect. In the absence of such implementing legislation, contend the Chelalas, the Treaty is merely executory. They conclude that the summons must be quashed because it was issued pursuant to a treaty which is of no legal effect at the present time.

## A

We must first decide whether the Chelalas have standing to raise this challenge. To satisfy the standing requirement of Art. III of the Constitution, the

Chelalas must establish that they suffered (1) an "injury in fact" to a legally protected interest that is (2) "fairly traceable to the challenged action of the defendant" and is (3) likely to be redressed by a favorable decision from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

The Chelalas meet the first two standing requirements. They have suffered an injury in fact-the IRS has summoned their bank records-and this injury is traceable to the Treaty whose constitutional validity they are challenging. However, the Chelalas' challenge to the Treaty founders on the redressability prong of the standing analysis. Even if we were to hold that the Treaty's double taxation provisions are non-self-executing because they infringe on Congress's exclusive powers, the Chelalas' injury would still not be redressed. As we explain below, the Treaty's exchange of information provisions, the sole cause of the Chelalas' injury, are severable from the double taxation provisions and are otherwise well within the scope of the treaty power. Hence, they are self-executing and can be validly applied against the Chelalas now, even if other provisions in the Treaty could not.

### B

The traditional test for severability in statutory cases has been stated as follows: "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law." *Board of Natural Resources v. Brown*, 992 F.2d 937, 948 (9th Cir.1993) (quoting *Alaska Airlines v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987)). Such an inquiry, the Supreme Court has explained, "is essentially an inquiry into legislative intent." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191, 119 S.Ct. 1187, 1198, 143 L.Ed.2d 270 (1999) (assuming, without deciding, that the severability test for statutes applies to executive orders as well). We are not aware of any

federal court that has considered how this test applies to treaties. Given the nature of the Chelalas' challenge to the Treaty, however, we need not explore here the nuances involved in translating the traditional severability analysis to the treaty context.

The Chelalas do not, and in fact could not, insist that the double taxation provisions of the Treaty are per se unconstitutional. They merely contend that such provisions require implementing legislation because they invade an exclusive power of Congress and that their inclusion in the Treaty renders the entire Treaty non-self-executing. The nature of the Chelalas' constitutional challenge shapes our severability analysis. We must decide whether the Treaty partners would have intended for articles 27 and 28 of the Treaty to be "fully operative" as self-executing provisions even if the remainder of the Treaty was non-self-executing and required implementing legislation before taking effect.

We have no difficulty in answering this question affirmatively. To begin with, it is far from uncommon for a treaty to contain both self-executing and non-self-executing provisions. *See* Restatement (Third) Foreign Relations Law of the United States § 111 cmt. h (1986) ("Some provisions of an international agreement may be self-executing and others non-self-executing."); *see also United States v. Postal*, 589 F.2d 862, 884 n. 35 (5th Cir. 1979) ("A treaty need not be wholly self-executory or wholly executory."); *United States v. Noriega*, 808 F.Supp. 791, 797 n. 8 (S.D.Fla.1992) (holding that some provisions of the Geneva Convention Relative to the Treatment of Prisoners of War are self-executing while others are not). Nothing in the Treaty indicates that the parties drafted it as they did with an eye to the precise contours of the subsequent political process which would be required for its various provisions to take effect. Furthermore, the exchange of information provisions are entirely independent of the double taxation provisions and, in fact,

were included in the Treaty to respond to an entirely separate concern, the prevention of tax evasion.

### C

The Chelalas have not argued that the Treaty's exchange of information provisions, standing alone, would encroach upon exclusive Congressional power or otherwise exceed the scope of the treaty power. Such an argument would surely fail in any event, since nothing in the Constitution grants Congress the exclusive power to authorize the exchange of lawfully collected financial information with foreign states. Thus, even if the double taxation provisions do exceed the treaty power and hence require implementing legislation, the exchange of information provisions are severable and self-executing. *Cf. Edwards v. Carter*, 580 F.2d 1055, 1081 (D.C.Cir. 1978) (MacKinnon, J., dissenting) ("[T]he property disposition portion of the [Panama Canal Treaty] under the Constitution constitutes a severable international agreement that cannot constitutionally come into force unless the entire 'Congress' approves that transfer.... Obviously Congress may not be required to approve other parts of the treaty."). A favorable ruling on the Chelalas' constitutional challenge would not redress their injury; therefore, they do not have standing to raise it.

### III

■ The Chelalas next contend that the IRS may only issue summonses for the investigation of domestic tax liabilities. The summons in question here was issued pursuant to 26 U.S.C. § 7602(a), which grants the IRS authority to issue summonses for the purpose of "determining the liability of any person for any internal revenue tax." Appellants contend that the summons here was improper because it related to a "foreign" rather than "internal" tax liability. This very argument was rejected by the Second Circuit in *United States v. A.L. Burbank & Co., Ltd.*, 525

F.2d 9 (2d Cir.1975) (holding that IRS can issue summons under § 7602 to obtain information for treaty partner). We reject it, as well.

Article 27–4(a) of the Treaty provides:

If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall obtain the information to which the request relates in the same manner and to the same extent as if its own taxation were involved, notwithstanding the fact that the other State may not, at that time, need such information for purposes of its own tax.

Upon its ratification, the Treaty became part of the law of the United States. *See Bacardi Corp. of America v. Domenech*, 311 U.S. 150, 161, 61 S.Ct. 219, 85 L.Ed. 98 (1940). The IRS is thereby bound by law to employ the same procedures to obtain information requested by France pursuant to the Treaty as it would employ in the investigation of a domestic tax liability. *See Burbank*, 525 F.2d at 14–15. Although neither party to the Treaty is required, acting on behalf of the other, to exceed its own lawful authority with respect to administrative measures, *see* art. 27–2(a), or to "supply particulars" not obtainable under domestic law, *see* art. 27–2(b), these provisions cannot be interpreted to forbid the IRS from using its summons power to obtain information relating to French tax liabilities. Such an interpretation would nullify the very purpose of article 27.[1] *See Burbank*, 525 F.2d at 13–14.

### IV

■ The Chelalas also contend that the district court erred in granting summary judgment in favor of the United States enforcing the summons. To obtain enforcement of an administrative summons issued pursuant to 26 U.S.C. § 7602(2), the IRS need only demonstrate "good faith" in

---

1. The Chelalas' argument that article 27 permits issuance of summonses only for investigations of tax violations that require a show-

ing of specific intent is frivolous on its face. Article 27 contains no such limitation.

issuing the summons. The IRS's prima facie showing of good faith is based on the four-part test formulated in *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). The IRS must show that: (1) the investigation will be conducted for a legitimate purpose; (2) the inquiry will be relevant to such purpose; (3) the information sought is not already within the Commissioner's possession; and (4) the administrative steps required by the Internal Revenue Code have been followed. *See id.* at 57–58, 85 S.Ct. 248.

■■■ The same test applies where the IRS issues a summons at the request of a tax treaty partner. *See United States v. Stuart,* 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989). In such case, the IRS need not establish the good faith of the requesting nation. "So long as the IRS itself acts in good faith [under *Powell* ] ... and complies with applicable statutes, it is entitled to enforcement of its summons." *Id.* at 370, 109 S.Ct. 1183.

■■■ Once the IRS establishes a prima facie case for enforcement of its summons under *Powell,* the burden shifts to the taxpayer, who "may challenge the summons on any appropriate ground," including failure to meet the *Powell* requirements. *See Powell,* 379 U.S. at 58, 85 S.Ct. 248. Nevertheless, the taxpayer bears a "heavy burden" to rebut the presumption of good faith. *United States v. Jose,* 131 F.3d 1325, 1328 (9th Cir.1997) (en banc).

### A

■■■ To establish its prima facie case under *Powell,* the IRS submitted the declaration of IRS Assistant Commissioner (International) John T. Lyons. (ER 153–56.) Lyons declared that (1) he is authorized to act as the "Competent Authority" for the purpose of administering all exchange of information programs of tax treaties; (2) pursuant to the Treaty,[2] the French Government requested information regarding the Chelalas' 1993 and 1994 in-

come tax liability; (3) he reviewed the French request and determined it to be proper under the Treaty; (4) the requested information was not in the possession of the IRS or the French tax authorities; (5) the requested information may be relevant to a determination of the Chelalas' French income tax liability; and (6) the requested information is the same type of information that could be obtained under French law.

Courts have consistently recognized that declarations or affidavits by IRS directors or agents generally satisfy the *Powell* requirements. *See, e.g., Stuart,* 489 U.S. at 360–61, 109 S.Ct. 1183; *Barquero v. United States,* 18 F.3d 1311, 1317 (5th Cir. 1994). In fact, Lyons's declaration is virtually indistinguishable from the affidavit submitted by the IRS Director of Foreign Operations in *Stuart.* The Court held that such affidavit established the IRS's prima facie case under *Powell. See Stuart,* 489 U.S. at 360–61, 109 S.Ct. 1183. Thus, Lyons's declaration "plainly satisfied the requirements of good faith we set forth in *Powell* and have repeatedly reaffirmed." *Id.* at 360, 109 S.Ct. 1183.

### B

The Chelalas attempt to rebut the prima facie case entitling the United States to summary enforcement of the summons by demonstrating the IRS's improper purpose in issuing the summons. They also contest enforcement of the summons on the ground that they did not receive notice as required by 26 U.S.C. § 7609, the Hague Service Convention and their constitutional right to procedural due process. The Chelalas have utterly failed to met their "heavy burden." *Jose,* 131 F.3d at 1328.

### 1

■■■ The Chelalas contend that the IRS summons sought their financial information for the improper purpose of dis-

---

**2.** Lyons mistakenly declared that the information was requested pursuant to article 26 of the Treaty rather than article 27. This mistake is of no legal import.

closing such information to French authorities, which they insist violates the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. § 3401 *et seq.*

RFPA provides that "no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution ..." except in limited circumstances and only after the government provides the customer with notice and an opportunity to challenge the disclosure of such information. 12 U.S.C. § 3402. One exception to RFPA is found at 12 U.S.C. § 3413(c): "Nothing in this chapter prohibits the disclosure of financial records in accordance with procedures authorized by Title 26." Consistent with the plain meaning of this language, courts have consistently interpreted RFPA as exempting IRS summonses provided that the IRS followed appropriate Title 26 procedures. *See Barquero v. United States,* 18 F.3d 1311, 1318 (5th Cir.1994); *Neece v. IRS,* 922 F.2d 573, 577 (10th Cir.1990); *United States v. MacKay,* 608 F.2d 830, 834 (10th Cir.1979).

2

The IRS sought the Chelalas' financial information pursuant to its summons authority under 26 U.S.C. § 7602. The procedures the IRS must follow when issuing third-party summonses pursuant to § 7602 are set out in § 7609. Section 7609(a) provides that notice of a third-party summons must be given to any person identified in the description of the records contained in the summons. Section 7609(a)(2) further provides that the notice is sufficient if it is "mailed by certified or registered mail to the last known address of such person. . . ."

The Chelalas contend that the IRS failed to send notice of the summons to their "last known address" in violation of 26 U.S.C. § 7609(a). Although the IRS was informed on a number of occasions that their tax home was the Congo, the Chelalas lament that the IRS did not send them notice there. This argument is without merit. The IRS did more than enough to comply with § 7609. It sent notice of the summons to the address for the Chelalas appearing on an IRS Form 2848, a form signed by the Chelalas themselves and submitted by the long-time tax representative of Lidas, Thomas Rossitto. *Cf. King v. Commissioner,* 857 F.2d 676, 679 (9th Cir.1988) (holding that the IRS is entitled to rely on the address appearing on a tax form as the "last known address" in the absence of "clear and concise notification from the taxpayer directing the Commissioner to use a different address"). The IRS also sent notice of the summons to the address for the Chelalas provided by French authorities; to Lidas, of which the Chelalas were the sole ultimate shareholders; and to Rossitto himself. There is no indication that the IRS was ever apprised of the Chelalas' actual Congo address until the day the bank was to appear. Notice of the summons was more than sufficient.[3]

The IRS complied with § 7609 in issuing the summons. Under 26 U.S.C. § 6103(k)(4), the IRS may disclose information collected through the issuance of such summonses "to a competent authority of a foreign government which has an income tax or gift and estate tax convention, or other convention or bilateral agreement relating to the exchange of tax information, with the United States." Thus, Title

---

**3.** The Chelalas at times fashion their objection to service of the IRS notification as an objection to the district court's subject matter jurisdiction. Presumably, this is because they confuse the discussion of personal jurisdiction in *United States v. Desert Palace, Inc.,* 43 A.F.T.R.2d 79–1128 (D.Nev.1979), in which the court held that the IRS's failure to comply with § 7609 deprived the court of personal jurisdiction over the taxpayer, with the dis-

cussion of the court's subject matter jurisdiction to entertain suits against the United States to quash an IRS summons developed in cases such as *Ponsford v. United States,* 771 F.2d 1305 (9th Cir.1985). Appellants' suit to quash the summons was timely and thus does not implicate the subject matter jurisdiction issue faced in *Ponsford.* Nor is personal jurisdiction at issue here.

26 authorizes both the collection and disclosure to France of the Chelalas' financial information in the possession of the bank.

### 3

■ We similarly reject the Chelalas' final arguments, in which they allege violations of procedural due process and the Hague Service Convention because they purportedly did not get "actual receipt" of notice of the IRS summons. Due process merely requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane v. Central Hanover Bank and Trust,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The IRS more than met such standard here.

■ Nor have the Chelalas called our attention to anything in the Hague Service Convention requiring "actual receipt" of such notice. In fact, article 10(a) of the Convention provides that it is not meant to prohibit "the freedom to send judicial documents, by postal channels, directly to persons abroad." Proof of actual receipt is not required. *See Randolph v. Hendry,* 50 F.Supp.2d 572, 578 (S.D.W.Va.1999).[4]

### V

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

4. The Hague Service Convention likewise did not require the notice of the summons to have been translated into French, as the Chelalas contend. While the Central Authority of Convention members may elect to require translation of documents, *see* article 5(b), the Chelalas have not called our attention to any evidence that France has done so here.