David A. COHEN, et al.

v.

UNITED STATES OF AMERICA.

No. Civ.A. 03–3234.

United States District Court,
E.D. Pennsylvania.

Feb. 10, 2004.

E. David Chanin, Tannenbaum & Chanin, LLP, Philadelphia, PA, for Plaintiffs.

Stuart D. Gibson, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

Xélan, The Economic Association of Health Care Professionals, is a California-based organization that has marketed "tax reduction plans" and other services to tens of thousands of physicians under the leadership of dentist-cum-financial guru L. Donald Guess.[1] Pursuant to an investigation into the tax liability of two xélan

---

1. We note that xélan, which like "e.e. cummings" eschews capitalization, is a veritable family of corporations and affiliated financial advisors, the following of which are petitioners in this action: xélan, Inc; xélan Administrative Services, Inc.; xélan Investment Services, Inc.; xélan Foundation, Inc.; xélan Annuity Co., Ltd.; xélan, The Economic Association of Health Professionals, Inc.; Pyramidal Funding Systems, Inc., d/b/a xélan Insurance Services; and Jaye and Junck Consulting, Inc. We can only speculate on the origins of xélan's name, though the presence of the acute accent reminds one of the word meaning "[a]rdor, impetuousness, vivacity." *See élan* def. b, v. *The Oxford English Dictionary* 107 col. 2 (2d ed.1989). Xélan's website, which is largely "Doctors Only," sheds no light on this point. *See* http://www.xelan.com.

members, Doctors David and Margaret Cohen, the Internal Revenue Service has issued summonses directing SEI Private Trust Company of Oaks, Pennsylvania, to produce documents relating to a disability trust program with more than $400 million in assets that it administered on xélan's behalf until September of 2003.[2]

The Cohens and xélan have filed petitions to quash the summonses, and the Government has filed an omnibus motion for summary enforcement. For the reasons provided below, we dismiss the petitions to quash and grant the Government's motion for enforcement.

*Factual and Procedural Background*

Petitioner Dr. David A. Cohen is a Florida orthodontist and the sole full-time employee and shareholder of David Andrew Cohen, DMD, MS, PA. His wife, petitioner Dr. Margaret Cohen, is a pathologist and employee of Ameripath, Inc. In May of 1997, xélan prepared a "Tax Reduction Plan" for David Cohen that promised to lower his federal income taxes from $143,040 to $49,880 per annum and enable him to achieve a "Critical Capital Mass" of $3,000,000 by diverting as much of his practice's net income as possible into purportedly tax-free and tax-deferred programs. *See* Marien Decl. Ex. 1.

Around the time that her husband received his Tax Reduction Plan, Margaret Cohen successfully lobbied Ameripath for leave to participate in xélan. According to a document the IRS obtained, she sent Vice President of Human Resources Stephen Fuller a xélan videotape along with a letter containing the friendly warning that if the company wanted to attract good pathologists, "strategies must be developed to lower their tax liability" because "[h]igh income employees ... will not tolerate the current structure of withholding

from their salary for long." Marien Decl. Ex. 7.

Between January of 1998 and June of 2002, the Cohens accumulated over a million dollars in xélan-sponsored programs, thereby claiming hundreds of thousands of dollars in tax savings. David Cohen's professional corporation remitted about $393,500 in purported premiums to the xélan disability insurance trust. Cohen did not report these premiums as income, and the corporation fully deducted them as the qualified cost of purchasing disability insurance for its employee. Ameripath similarly withheld, pre-tax, some $504,852 from Margaret Cohen's salary and remitted it to the disability insurance trust. Finally, David Cohen has claimed charitable deductions for contributions of approximately $200,000 to the xélan Foundation, which administers "personal public charity foundations" from which "[d]octors and family members of doctors may be compensated ... for their own teaching, research, and other pro-bono work on charitable projects important to them that are approved for funding by the Board of Directors...." Marien Decl. Ex. 1, at 19.

The Internal Revenue Service is now examining the tax liabilities of the Cohens and David Cohen's professional corporation for the years 1998 to 2001. Pursuant to its investigation, the Service has issued summonses directing SEI Private Trust Company to produce all documents in its possession relating not only to the Cohens but also to all other participants in the disability trust. The Cohens and xélan have filed petitions to quash these summonses, arguing that the IRS is seeking information from SEI in bad faith and that its purpose is to uncover the identities of other xélan participants without complying

---

**2.** According to a declaration of Paul Dunn, the President of xélan Investment Services, Inc., xélan has transferred the accounts whose records are at issue here to the Vanguard Group. Dunn Decl. ¶ 13.

with the procedural requirements for a "John Doe" summons under I.R.C. § 7609(f).[3]

*Discussion*

The Internal Revenue Code grants the IRS authority to issue administrative summonses for the production of "books, papers, records, or other data" to determine the correctness of any return or the tax liability of any person. I.R.C. § 7602(a)(1). The Supreme Court has underscored the breadth of this power by analogizing it to that of a grand jury, "which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).

■■■ This Court has jurisdiction under I.R.C. §§ 7402(b) and 7604(a) to enforce IRS summonses. Our Court of Appeals has observed that "[s]ummons enforcement proceedings are designed to be summary in nature, and their sole purpose is to ensure that the IRS has issued the summons for a proper purpose and in good faith." *United States v. Rockwell Int'l*, 897 F.2d 1255, 1261 (3d Cir.1990). In determining whether the summonses are enforceable, we apply *Powell's* burden-shifting regime. First, the Government must make a prima facie showing that (1) the investigation will be conducted pursuant to a legitimate purpose, (2) the inquiry may be relevant to that purpose, (3) the information sought is not already within the Commissioner's possession, and (4) the administrative steps that the Code requires have been followed. *Powell*, 379 U.S. at 57–58, 85 S.Ct. 248. The petitioner must then prove either that the Government has

not satisfied one of the elements of its prima facie case or that enforcement of the summons would be an abuse of the court's process. *Id.* Although the petitioner need not conclusively disprove the prima facie case, he must point to serious weaknesses in the Government's proffer or create a "substantial question in the court's mind" concerning the Government's purpose. *United States v. Gertner*, 65 F.3d 963, 967 (1st Cir.1995).

### A. The Government's Prima Facie Case

In support of its prima facie case, the Government has offered the declarations of Internal Revenue Agent Catherine Johns, who is conducting the Cohen audit, and Agent John L. Marien, an IRS Technical Advisor who specializes in the improper uses of employee welfare benefit funds and is assisting Agent Johns in her investigation. Upon scrutiny of these detailed affidavits, we conclude that the Government has established a prima facie case for the enforcement of these summonses.

First, Agents Marien and Johns have declared that the Service is seeking information from SEI for the legitimate purpose of determining the Cohens' tax liability and that it can properly proceed under § 7602 because there has been no Justice Department referral. Johns Decl. ¶¶ 3, 9–10; Marien Decl. ¶¶ 37–38. It is well-settled that an affidavit of the investigating officer is sufficient to make a prima facie case, and we therefore find that the Government has established the first prong of its prima facie case under *Powell*. *Gertner*, 65 F.3d at 966.

■■■ Somewhat more controversially, we find that the IRS has made a prima facie showing that the examination of SEI's rec-

---

**3.** The Cohens and xélan filed three petitions, which were docketed under Civil Action Nos. 03–3234, 03–3238, and 03–3239. We consolidated them under Civil Action No. 03–3234.

The IRS subsequently withdrew the two summonses that were the original subject-matter of Civil Action No. 03–3234.

ords may be relevant to the Cohen audit, even though it will reveal the identities of other insureds and the details of their participation in the trust. Agent Marien's declaration offers two justifications for such an expansive investigation. In the first place, he asserts that an examination of all the records in SEI's possession may enable the IRS to confirm whether the trust is, in fact, a program of insurance. Second, he declares that even if the Service concludes that the trust indeed qualifies as insurance, the investigation may assist the IRS in determining whether David Cohen's corporation was entitled to deduct the full amount of the premiums it paid on his behalf and whether both Cohens could exclude remittances to the trust from their taxable incomes.

To grasp both the Government's position and our reasons for concluding that it has met its burden under the second prong of the *Powell* test, it is helpful to begin with a summary of the IRS's current understanding of the disability trust's structure and operation. According to Agent Marien, xélan touts the disability trust as a "new approach to disability coverage 'that combines savings along with the disability coverage component.'" Marien Decl. ¶ 18 (quoting audiotape presentation of Donald Guess). Doctors can contribute any amount from $4,000 per annum up to their practices' entire net income to the program, which is administered in the British Virgin Islands by Euro American Trust and Management Services, Ltd. ("Euro American"). The Service believes that in the years at issue here, about ninety-six percent of premiums went into what Dr.

Guess has termed "segregated accounts" at SEI, and much like a 401(k) plan, these funds were placed in a variety of investment vehicles of the participants' choosing.[4] Under the terms of the program, a vested participant who does not become disabled is eventually entitled to a refund of premiums, along with the earnings on those premiums that have accrued on a purportedly tax-deferred basis.

The Service is concerned that the trust may not, in fact, qualify as an insurance scheme entitling its participants to the tax benefits that the Cohens have so aggressively claimed. The United States Supreme Court long ago held that for an arrangement to constitute insurance for federal income tax purposes, it must *shift* to the insurance plan the risk that a participant will experience a loss and *distribute* each participant's risk of loss among all the participants. *Helvering v. Le Gierse,* 312 U.S. 531, 539, 61 S.Ct. 646, 85 L.Ed. 996 (1941).

As Agent Marien has explained, the structure of the trust as well as xélan's own reports to the Cohens lead the Service to suspect that the trust does not bear the hallmarks of risk shifting and distribution. The use of "segregated accounts," the ability of participants to direct the investment of their funds, and xélan's provision of monthly account statements suggest that the trust is more akin to a savings plan than to a scheme of insurance. *See, e.g.,* Marien Decl. Ex. 2 (account statement providing "market value" of segregated account as of January 31, 1998). Moreover, xélan's marketing materials and the indi-

---

4. Xélan apparently uses the remaining four percent of premiums for claims and other expenses. Insurance benefits are provided by Doctors Benefit Insurance Company, Ltd., formerly known as the xélan Disability Insurance Company, which the IRS believes is a Barbadian corporation. It is noteworthy that at the time it briefed this case, the IRS was apparently unaware that the insurance company had changed its name. *See* Marien Decl. ¶ 33.F. This unintentional inaccuracy would seem to underscore how little the IRS actually knows about the workings of the xélan disability insurance program, an issue we address below at greater length.

vidualized reports it has provided the Cohens describe trust funds as an asset that they can draw on in the future, with nary a reference to the possibility that xélan may use these funds to pay other participants' claims. *See* Marien Decl. ¶ 18 (noting that, in an audiotape presentation, Dr. Guess describes the refund provision of the trust as an "equity feature"); Marien Decl. Exs. 4 & 5 ("annual updates" for David Cohen describing funds in disability trust as "qualified plan asset," confirming that all such assets "are available eventually to satisfy your lifestyle needs," and advising Cohen to place all surplus income in "various Xélan [*sic*] pre-tax savings plans, i.e. . . . Disability Equity Trust Plans, Malpractice Equity Trust Plans, Long Term Care Equity Trust Plans and Family Public Charity/xélan Foundation Plans").

In addition, the IRS argues that even if the disability trust is actually providing insurance, its investigation of the SEI records may help it calculate the limits, if any, on the deductibility and excludability of the hundreds of thousands of dollars in premiums that the Cohens' employers have paid into the trust. An employer can deduct contributions to a trust providing employee welfare benefits under I.R.C. § 162, but I.R.C. § 419 limits the employer's deduction to the "qualified cost" of the insurance coverage that the trust actually purchases on the employee's behalf. In view of the eyebrow-raising amounts that the Cohens have arranged for their employers to remit to the trust, it is entirely possible that these premiums are disproportionate to the value of any insurance

benefits the Cohens are deriving from the scheme.

We readily conclude that information in SEI's possession concerning the general administration of the trust and the Cohens' experience as participants are subjects relevant to their audit. The more difficult question is whether the IRS has made a prima facie showing that the wholesale disclosure of other participants' identities and financial information is relevant here. The Service has offered two major justifications for this aspect of the investigation contemplated in the summonses. In the first place, the inquiry will enable the Service to develop a more complete understanding of how xélan and the other participants treated their contributions and earnings as well as whether account activity provides evidence of risk shifting and distribution.[5] According to the IRS, its need to gather more complete information on the trust is particularly pressing because xélan officials have been less than forthcoming about the operation of the trust and because the Insurance Company and Euro American are offshore entities beyond even the long arm of the IRS.[6] Second, the IRS asserts that it may need to contact other participants to verify their age, health, occupation, and other risk factors in order to determine the qualified cost of the Cohens' disability insurance. In other words, access to the other participants' identities and whereabouts would allow the IRS to reconstruct the actuarial underpinnings of the disability program, an admittedly Herculean step but one that

5. For example, the inquiry may enable the IRS to determine whether xélan has ever dipped into a participant's "segregated account" to pay another participant's claim.

6. According to Agent Marien, the IRS deposed Dr. Guess in January of 2003. At that time, he could not or would not identify the

parties who own or control the xélan Disability Insurance Company, explain the meaning of the term "segregated accounts," or explain how xélan calculates the purported insurance premiums. Dr. Guess referred the IRS to one Leslie S. Buck for more information but said he was unable to provide Buck's address or phone number. Marien Decl. ¶ 33.J.

is well within the IRS's broad investigatory powers.

As our discussion should make apparent, Agent Marien has offered a highly particularized articulation of the Service's reasons for pursuing the SEI investigation and how the information it hopes to uncover will shed light on the Cohens' tax liability. We therefore conclude that the IRS has made a prima facie showing of relevance. We now turn to consider whether the Service has satisfied the third and fourth prongs of the *Powell* test.

Under the third prong, the Service must show that the information sought is not already within its possession. The IRS satisfies this requirement because Agents Marien and Johns have declared that the documents and testimony the IRS seeks from SEI in these summons are not already in the Service's possession. Johns Decl. ¶ 7; Marien Decl. ¶ 39. Moreover, Agent Marien has amply substantiated this assertion by detailing the IRS's difficulty in obtaining information from xélan about the operation of the trust. *Id.* ¶ 35. Finally, xélan has impliedly conceded that the IRS lacks complete information relating to other participants by entering an appearance in these proceedings and contesting its disclosure.

Fourth, and finally, the IRS must show that it has followed all administrative steps required under the Internal Revenue Code for the issuance of the summonses. Agent Johns has so declared, and she has thus established this element of the Service's prima facie case. Johns Decl. ¶ 8.

### B. The Petitioners' Response to the Service's Prima Facie Case

Because the IRS has established a prima facie case for the enforcement of these summonses, the burden shifts to xélan and the Cohens to prove either that the Service has not satisfied one of the elements of its prima facie case or that enforcement of the summons would be an abuse of the court's process. The petitioners advance a number of arguments against enforcement, each of which we examine in turn.

■ First, the petitioners argue that the IRS has failed to show that the identities of other trust participants are relevant to the Cohen audit because the trust does not, in fact, employ "segregated accounts" whose fluctuating value could confirm whether or not the disability plan is a program of insurance. Instead, xélan reports to us, the trust uses employer contributions to pay premiums on a group insurance policy issued by Doctors Benefit Insurance Company, participants have no ownership interest in the invested reserves, and the monthly statements from SEI merely show each participants' pro rata share of the trust's reserves, which may or may not be refundable depending on the claims experience of the entire pool of insureds.[7] Buck Decl.[8] ¶¶ 11–13; Dunn Decl. ¶¶ 7–10.

---

7. The petitioners have also brought to our attention a 1983 Revenue Ruling in which the Service concluded that reserve premiums subject to a retrospective rate refund clause under the malpractice liability policy described in the Ruling were deductible as business expenses in the year paid. *See* Rev. Rul. 83–66, 1983–1 C.B. 43, 1983 WL 189979. The applicability of this Ruling to the xélan disability trust is wholly outside the scope of these proceedings.

8. In support of these claims, xélan offers the declaration of none other than Leslie S. Buck. As we observe above in note 6, the Government has represented that Dr. Guess was unable to shed any light on Buck's whereabouts at his deposition in January of 2003, despite the fact that Buck was a high-ranking officer in several xélan entities from 1987 until his resignation (prompted by a "routine SEC audit") in April of 2001. Buck Decl. ¶ 7. We surmise that xélan tracked down its elusive former executive in the course of responding to the motion for summary enforcement.

This argument fails to address the Service's showing that the disclosure of other participants' identities may help resolve the qualified cost issue. In addition, Buck's and Dunn's descriptions of how the trust operates vary so greatly from the representations in xélan's own reports to the Cohens that the divergence itself substantiates the IRS's case. As we note above, both the monthly statements and xélan's annual updates create the impression that the Cohens' premium contributions are still their assets. While some day it may turn out that xélan's assurances to this Court concerning the trust are true, the disjuncture between these representations and the documents now in the Service's possession underscores both the IRS's interest in developing a complete understanding of the trust's operation and the relevancy of this inquiry to the Cohen audit.

Second, the petitioners make the related argument that the SEI summonses are, in essence, nullities because they call for the production of documents relating to the Cohens' and other participants' "investments" with SEI, whereas all the xélan-related funds at SEI were held for and owned by Doctors Benefit Insurance Company. This argument is too clever by half. The summonses themselves define the term "investment" as "any funds held by or for SEI for the benefit of employers or their respective employees as a result of their relationship with xélan" and related entities. *See, e.g.,* Johns Decl. Ex. 1 ¶ 14. Such a definition encompasses the funds that SEI formerly held. Even on the petitioners' version of how the trust operates, plan participants have a beneficial interest in trust assets, as evidenced by the refund provision that is such a prominent feature

of the disability program and SEI's production of monthly account statements.

Third, xélan and the Cohens argue that in compelling the production of documents relating to trust participants other than the Cohens, the IRS has circumvented the "John Doe" summons procedures of I.R.C. § 7609(f) and is acting in bad faith for the sole purpose of identifying xélan participants and subjecting them to audits.[9] Section 7609(f) requires the IRS to obtain judicial approval before issuing a summons seeking information relevant to the tax liability of an unnamed party. However, the Supreme Court has held that the Service need not comply with § 7609(f) where it serves a summons with the dual purpose of investigating both known and unknown taxpayers, so long as the information sought may be relevant to a legitimate investigation of the named parties. *Tiffany Fine Arts, Inc. v. United States,* 469 U.S. 310, 323–24, 105 S.Ct. 725, 83 L.Ed.2d 678 (1985).

The petitioners seek to escape the implications of *Tiffany Fine Arts* by invoking a line of cases in which courts have refused to enforce IRS summonses that would have required the disclosure of third parties' identities. In *United States v. Gertner, supra,* for example, two lawyers reported to the IRS that their firm had received sizeable cash payments from a client, but they declined to disclose the client's name on attorney-client confidentiality grounds. The IRS then opened an investigation into the law firm's tax liability and issued summonses for certain records that would have revealed the client's identity. The district court concluded that the audit of the firm was a pretext for the anticipated investigation of the client, and

---

9. The petitioners also bolster their bad faith argument by pointing to what they regard as the perfidy of one Agent John Wong, who allegedly stole materials from xélan that

brought the Cohens within the IRS's cross hairs. We examine this claim in more detail below.

it refused to enforce the summonses. *Gertner*, 65 F.3d at 965. The Court of Appeals for the First Circuit upheld the district court, reasoning that the case was distinguishable from *Tiffany Fine Arts* because "the IRS did *not* have an actual interest in the investigation of the taxpayer (the respondents' law firm), but *only* in learning more about John Doe." *Id.* at 971 (emphasis in original); *see also David H. Tedder & Assoc., Inc. v. United States*, 77 F.3d 1166, 1170 (9th Cir.1996) (upholding district court determination, after *in camera* review of lawyer's bank records that were subject of summonses, that clients' names were not, per se, relevant to lawyer's audit).

The difficulty with the petitioners' argument is that in both *Gertner* and *Tedder* the courts found that the clients' identities were not relevant to the tax liability of their attorneys. Here, by contrast, we have already concluded that the identities of the Cohens' fellow xélots (to coin a phrase) are relevant to the IRS's examination of the Cohens, and thus *Tiffany Fine Arts* squarely governs this case.[10]

■ Fourth, the petitioners claim that the Government has failed to show that the information sought through these summonses is not already in its possession because xélan has already provided the IRS with thousands of pages of documents, including account statements for three hundred other trust participants and independent (but xélan-commissioned) actuarial studies of the disability program.

However, the fact that the IRS may have already obtained copies of documents does not prevent it from seeking the originals, and it would defeat the Service's broad investigative powers were it required to rely on a pot-pourri of xélan-produced documents to answer the questions that the Cohen audit has prompted.[11] *See United States v. Davey*, 543 F.2d 996, 1000 (2d Cir.1976) ("The Service should not be required to rely on the taxpayer's affidavit that a print-out accurately reproduces all information [requested on tapes as s]uch a holding would run contrary to the investigatorial purpose of the audit."); *United States v. Administration Co.*, 1994 WL 240518, at *3 (N.D.Ill. May 31, 1994) ("That the IRS may have already obtained copies of documents it seeks from other sources in the tax court case does not prevent its seeking original documents from the respondents. The IRS is entitled, and it is a legitimate purpose to summon, original documents so as to check their consistency and completeness with those obtained elsewhere.").

■ Fifth, the petitioners claim that the Government has failed to show the relevance of SEI documents from 2002, a year not under examination in the Cohen audit. The IRS may use its summons power to seek information regarding a period outside the scope of an investigation provided it satisfies the relevancy requirement we have already applied here. *Barquero v. United States*, 18 F.3d 1311, 1318 (5th Cir.1994). Here, Agent Marien's declara-

---

10. It is appropriate to note here that xélan has offered to bear the cost of redacting the SEI account statements of other disability trust participants, and the parties have spilled some ink over whether a district court has the power to order such redaction in summons enforcement proceedings. Regardless of the answer to this question, there is no justification for redaction here because the IRS has shown the relevance of the other participants' identities—or to be more precise, their actu-

arial profiles, which the IRS can only conclusively confirm by contacting these participants in person.

11. Indeed, as we have already noted, the wide-ranging investigation into the disability program is manifestly relevant to the Cohen audit given the divergences between xélan's representations to this Court and its own members regarding the operation of the trust.

tion establishes that information from 2002 may help the IRS answer its questions about the operation of the trust. The Cohens were still participating in the disability program in 2002, and the petitioners have not even attempted to show that the disability trust in 2002 underwent a change so radical that documents from that year could not shed light on its operation in the period under investigation.

Sixth, in a last-ditch effort to stave off the disclosure of other participants' identities, xélan has stipulated that the SEI account statements will not evidence risk shifting and distribution. However, this stratagem fails because, as we have already noted, the other participants' identities are relevant to the Service's inquiry into the qualified cost issue. Moreover, as the Government has forcefully argued, there is no authority for the proposition that a taxpayer (or interested third party such as xélan) can by making such a stipulation hobble the power of the IRS to draw its own conclusions on a subject relevant to a taxpayer's liability. The IRS, in short, always has the right to cut the taxpayer's cards.

 Finally, we address the petitioners' request for an evidentiary hearing. Our Court of Appeals has directed that a hearing is warranted where the taxpayer has factually refuted material Government allegations or has factually supported an affirmative defense. *United States v. Garden State Nat'l Bank*, 607 F.2d 61, 71 (3d Cir.1979). A review of the petitioners' efforts to show the existence of disputed factual issues shows that they have not satisfied this standard. In the first place, they have produced a sizeable body of evidence in support of their contention that the disability trust program is actuarially sound and satisfies the definition of insurance. While this evidence is certainly relevant to the petitioners' underlying dispute with the Service, it does not call into ques-

tion the Service's purpose in seeking additional information or verifying xélan's representations concerning the trust.

The petitioners also point to what they characterize as the IRS's pattern of "subterfuge, deception and harassment" in its dealings with xélan to support their request for an evidentiary hearing, as well as restate their overarching claim that bad faith taints these summonses. Petitioners' Mem. at 6. According to the petitioners, IRS Agent John Wong stole a list of contributors to the xélan Foundation during a 2001 examination into the Foundation's tax-exempt status. The list found its way to IRS agents in Florida, and a number of xélan participants received notices of examination suspiciously soon thereafter. The (alleged) treachery of Agent Wong is the subject of a lawsuit in California and has prompted an internal IRS investigation. Jacquot Decl. ¶ 7–24; Suverkrubbe Decl., at 4 (noting that the IRS Inspector General for Tax Administration has commenced an investigation of Agent Wong and that he is currently on administrative leave).

To substantiate their claim that the Service's conduct demonstrates bad faith such that enforcement of the summonses would amount to an abuse of process, the petitioners must show that the IRS, as an institution, issued the summonses with some illegitimate intent or that particular agents' motives "infected the institutional posture of the IRS." *2121 Arlington Heights Corp. v. I.R.S.*, 109 F.3d 1221, 1226 (7th Cir.1997), *citing United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978).

Measured against this exacting standard, the petitioners' allegations regarding Agent Wong and his colleagues are not grounds for conducting an evidentiary hearing, much less quashing the summonses at issue here. Even if we assume that the alleged subterfuge of Wong and the

other agents stemmed from their desire to harass xélan and its members, the fact that the IRS is conducting its own investigation of this incident belies any claim that these agents' motive has infected the institutional posture of the Cohen audit.

For all the reasons provided above, we conclude that the petitioners have not created a substantial question as to the validity of the Government's purpose in investigating SEI's xélan-related records pursuant to its examination of the Cohens's tax liability. We will therefore deny the request for an evidentiary hearing, deny the petitions to quash, and grant the Government's motion for summary enforcement.[12]

---

**12.** The Service has sought attorneys' fees from the Cohens and xélan. As the detail and length of our analysis here has evidenced, we found their positions to be much more than frivolous taxpayer intransigence. Under the circumstances, we conclude that fee-shifting is unwarranted.