142 T.C. No. 11

UNITED STATES TAX COURT

ORY ESHEL AND LINDA CORYELL ESHEL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8055-12.                    Filed April 2, 2014.

In 1987, the United States and France entered into a
Totalization Agreement to coordinate benefits under their respective
social security systems. Section 317(b)(4) of the Social Security
Amendments of 1977 (SSA), Pub. L. No. 95-216, 91 Stat. at 1540,
provides that, notwithstanding any other provision of law, taxes paid
by an individual to a foreign country "in accordance with the terms
of" a totalization agreement shall not be creditable or deductible for
Federal income tax purposes.

In 2008 and 2009 Ps paid two taxes to the French Government
--<u>la contribution sociale généralisée</u> (CSG) and <u>la contribution pour le
remboursement de la dette sociale</u> (CRDS)--and claimed credits for
these payments under I.R.C. sec. 901. R disallowed the claimed
credits in reliance on SSA section 317(b)(4), contending that Ps paid
CSG and CRDS to France in accordance with the terms of the U.S.-
France Totalization Agreement.

1.  <u>Held</u>:  Taxes are paid to a foreign country "in accordance with the terms of" a totalization agreement if those taxes are covered by, or within the scope of, the totalization agreement.

2.  <u>Held</u>, <u>further</u>, CSG and CRDS are covered by, or within the scope of, the U.S.-France Totalization Agreement because they "amend or supplement" the French social security laws enumerated in that Agreement.

3.  <u>Held</u>, <u>further</u>, SSA section 317(b)(4) precludes Ps' foreign tax credits for CSG and CRDS paid to France in 2008 and 2009.

<u>Stuart Evan Horwich</u>, for petitioners.

<u>Scott A. Hovey</u>, for respondent.

OPINION

LAUBER, <u>Judge</u>:  Respondent determined income tax deficiencies of $12,104 and $47,401 for petitioners' 2008 and 2009 tax years, respectively, and petitioners timely sought redetermination under section 6213.[1]  The deficiencies stem from disallowance of foreign tax credits that petitioners claimed for payment of certain French taxes.  The sole remaining issue for decision is whether two of

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code) in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

these taxes--<u>la contribution sociale généralisée</u> (general social contribution or CSG) and <u>la contribution pour le remboursement de la dette sociale</u> (contribution for the repayment of social debt or CRDS)--are creditable taxes for Federal income tax purposes. The parties have filed cross-motions for summary judgment on this question.

The parties agree that CSG and CRDS satisfy the usual standards for creditability under section 901. The question we must answer is whether section 317(b)(4) of the Social Security Amendments of 1977 (SSA), Pub. L. No. 95-216, 91 Stat. at 1540, nevertheless precludes credits for these taxes. This depends on whether CSG and CRDS "amend or supplement" specified laws making up the French social security system, in which case they are covered by the social security totalization agreement between the United States and France. We answer these questions in the affirmative and accordingly hold that CSG and CRDS are not creditable foreign taxes for Federal income tax purposes. We will therefore grant respondent's motion for summary judgment and deny petitioners' motion.

## Background

Ory and Linda Coryell Eshel, husband and wife, are dual citizens of the United States and France. They resided in France during 2008 and 2009. Ory Eshel worked for a non-American employer that paid him a salary for services

performed in France. Petitioners paid various taxes to France, including the French income tax, unemployment tax, CSG, and CRDS. During 2008-09 petitioners also paid French social security taxes and participated in the French social security system. Because Ory Eshel worked for a non-American employer, he was not required to pay social security taxes to the United States. See secs. 3101(a), 3111(a), 3121(b). Petitioners did not otherwise participate in the U.S. social security system during 2008-09.

By virtue of being U.S. citizens, petitioners were liable for U.S. income tax for 2008 and 2009, and they timely filed Federal income tax returns for both years. On these returns petitioners claimed credits under section 901 for the French income tax, French unemployment tax, CSG, and CRDS paid during each year. For 2008 petitioners paid $19,061 on account of CSG and CRDS; for 2009 they paid $32,672 on account of CSG and CRDS.

Respondent issued petitioners a notice of deficiency denying the entire foreign tax credit they had claimed for each year. Petitioners timely petitioned this Court for redetermination of the resulting deficiencies. Respondent has since conceded that all French taxes for which petitioners claimed credits, apart from CSG and CRDS, are creditable. The parties filed cross-motions for summary

judgment on the sole issue left for decision, namely, whether CSG and CRDS are creditable foreign taxes for Federal income tax purposes.

## Discussion

I.      Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid unnecessary and expensive trials.  See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001).  We may grant summary judgment when there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002).  The moving party bears the burden of proving that there is no genuine dispute as to any material fact, and the Court views all factual materials and inferences in the light most favorable to the nonmoving party.  Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985).

The parties agree on all questions of basic fact and have expressed that consensus by filing cross-motions for summary judgment.  The parties disagree on one point that may be relevant in interpreting the international agreement at issue-- namely, how the French Government, at various times, has characterized CSG and CRDS for purposes of EU law and internal French law.  See infra pp. 40-47.  We

conclude that this disagreement does not give rise to a material factual dispute that would prevent the Court from deciding this case on summary judgment.

Under Rule 146, this Court's determination of foreign law "shall be treated as a ruling on a question of law."[2]  As a result, disputes about the proper interpretation or characterization of a foreign law are not disputes of material fact that preclude summary judgment.  See Reese v. Commissioner, 64 T.C. 395, 397 (1975); Access Telecom, Inc. v. MCI Telecomm. Corp., 197 F.3d 694, 713 (5th Cir. 1999) ("[D]ifferences of opinion among experts on the content, applicability, or interpretation of foreign law do not create a genuine issue as to any material fact[.]").  Under Rule 146 the Court "may consider any relevant material or source" in determining a principle of foreign law, but expert testimony or affidavits, accompanied by extracts from foreign legal materials, "ha[ve] been and will likely continue to be the basic mode of proving foreign law."  Universe Sales Co. v. Silver Castle, Ltd., 182 F.3d 1036, 1038 (9th Cir. 1999) (citing 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure:  Civil, sec. 2444 (2d ed. 1995)).

---

[2]Rule 146 is taken almost verbatim from Fed. R. Civ. P. 44.1.  See Note to Rule 146, 60 T.C. 1137.  The rules are functionally identical.  See Abdel-Fattah v. Commissioner, 134 T.C. 190, 194-195 (2010); PNC Fin. Servs. Grp., Inc. v. Commissioner, 503 F.3d 119, 126 (D.C. Cir. 2007), aff'g T.C. Memo. 2004-10.

While the parties' experts disagree on how the French Government over time has characterized CSG and CRDS, this is a difference of opinion among experts on the content, applicability, and interpretation of foreign law. This difference of opinion may have some bearing on our evaluation of these taxes under the international agreement involved here. However, it does not constitute a genuine dispute of material fact that prevents the Court from deciding the issue summarily.

II.     Governing Statutory Framework

Subject to certain limitations, a U.S. citizen or resident may elect to take a foreign tax credit against his U.S. income tax liability for income taxes paid or accrued to a foreign country or a U.S. possession. Sec. 901(a). This credit mitigates the effect of double taxation where, as here, France and the United States both seek to tax the same income. A foreign levy that is imposed on net gain is generally a creditable income tax. See sec. 1.901-2(b), Income Tax Regs. The Internal Revenue Service (IRS) has recognized that foreign social security taxes imposed on net income may qualify as creditable taxes under section 901. See, e.g., Rev. Rul. 69-338, 1969-1 C.B. 194 (Venezuelan social security tax payments creditable); Rev. Rul. 68-411, 1968-2 C.B. 306 (Canadian social security tax

payments creditable). Absent any other limitation, therefore, social security taxes paid to France generally would be creditable under section 901.

If a U.S. citizen divides his working career among multiple countries, he may pay social security taxes to various nations, in various amounts, during various periods of social security coverage. Before 1977 there was no authority in the Social Security Act for the United States to enter into agreements with other countries to provide for coordination between their social security systems. This lack of coordination posed two potential problems. First, the wages of a U.S. citizen employed by a U.S. company abroad might be subject to duplicative social security taxes in both nations. Second, U.S. citizens who divided their working careers among multiple countries might suffer a loss of continuity in their social security coverage. Under the U.S. and many foreign systems, entitlement to social security benefits depends on a person's period of coverage, that is, the number of years during which he or she has worked and "paid into the system." A U.S. citizen might work in numerous countries and pay into numerous social security systems, yet not accrue a sufficient period of coverage under any one system to qualify for benefits when he retires, becomes disabled, or dies. Alternatively, a U.S. citizen might qualify only for reduced benefits based on a period of coverage

considerably shorter than his entire working career. See generally H.R. Rept. No. 95-702 (Part 1), at 39 (1977), 1977 U.S.C.C.A.N. 4155, 4196.

To address these problems, Congress amended the Social Security Act in 1977 to authorize the President to enter into social security totalization agreements with foreign countries. SSA sec. 317(a), 91 Stat. at 1538. This authorization is now codified in section 233 of the Social Security Act, 42 U.S.C. sec. 433(a) (2006). It provides in relevant part:

> The President is authorized * * * to enter into * * * arrangements between the social security system established by this subchapter and the social security system of any foreign country, for the purposes of establishing entitlement to and the amount of old age, survivors, disability, or derivative benefits based on a combination of an individual's periods of coverage under the social security system established by this subchapter and the social security system of such foreign country.

Under a totalization agreement, a particular period of employment or self-employment results in a "period of coverage" under the U.S. social security system or the foreign social security system, but not both. See 42 U.S.C. sec. 433(c)(1)(B). A "period of coverage" is defined as "a period of payment of contributions or a period of earnings based on wages for employment or on self-employment income." Id. sec. 433(b)(2). A taxpayer pays social security taxes only to the country under whose social security system he is covered for that year.

By accruing periods of coverage in each country's system, the taxpayer will eventually be entitled to receive benefits ratably from each.

Pursuant to 42 U.S.C. sec. 433(a), the United States and France in 1987 executed a totalization agreement. Agreement on Social Security, U.S.-Fr., Mar. 2, 1987, T.I.A.S. No. 12,106 (Totalization Agreement). This Agreement entered into force July 1, 1988, and was thus in effect during the tax years at issue. It implements provisions designed to achieve both of the objectives that Congress expressed when enacting this scheme.

The first policy concern is addressed in articles 5 and 7, which provide that the United States and France will impose social security taxes on an individual only if he or she is currently employed within that state. This eliminates the possibility of double taxation. The second policy concern is addressed in articles 11, 12, and 13, which coordinate benefits between the United States and France. Article 11 provides that neither country shall "restrict[], suspend[] or terminate[] entitlement to or payment of cash benefits solely because the person resides out-side or is absent from" that state, so long as the person resides in the other state. Articles 12 and 13 implement the coordination of benefits by guaranteeing ratable

entitlement to social security benefits based on the individual's respective periods of coverage in each country.[3]

When Congress amended the Social Security Act to authorize the President to enter into totalization agreements, it made correlative amendments to the Internal Revenue Code. It amended Code sections 1401, 3101, and 3111 to exempt an individual's wages or self-employment income from U.S. social security taxes if there is a totalization agreement in effect with a foreign country and, under that agreement, such wages or self-employment income are subject to social security tax in that other country. SSA sec. 317(b)(1)-(3), 91 Stat. at 1539. In SSA section 317(b)(4), Congress added the provision at issue here, as follows:

---

[3]For example, assume that a French citizen spends 7 years (28 calendar quarters) working in the United States and 20 years (80 calendar quarters) working in France. Absent the Totalization Agreement, this person would not be eligible for U.S. old-age benefits at all, despite paying U.S. social security taxes for 7 years, because 10 years of covered employment are generally required for eligibility. 42 U.S.C. sec. 414 (2006). Under the Totalization Agreement, the United States would take into consideration the total number of years that this person worked in the United States and France; compute the old-age benefit for a worker with 27 years of U.S. coverage; and pay the individual a "totalized" old-age benefit equal to 7/27 of a 27-year benefit. France would also totalize benefits by paying the individual 20/27 of a 27-year benefit computed under its system. This totalization would ensure that the individual receives an old-age benefit reflecting all 27 years of his working career (7/27 of U.S. benefit and 20/27 of French benefit). See Georgiou v. Apfel, 50 F. Supp. 2d 913, 917 (E.D. Mo. 1999).

Notwithstanding any other provision of law, taxes paid by any individual to any foreign country with respect to any period of employment or self-employment which is covered under the social security system of such foreign country in accordance with the terms of an agreement entered into pursuant to section 233 of the Social Security Act shall not, under the income tax laws of the United States, be deductible by, or creditable against the income tax of, any such individual.

This statutory provision currently appears at 26 U.S.C. sec. 1401 note.[4]

This provision has the effect of preserving parity between taxpayers who spend their entire careers working in the United States and those who spend part of their careers working abroad. No credit or deduction can be claimed against Federal taxable income for U.S. social security taxes. In order to prevent disparity of treatment, SSA section 317(b)(4) bars a credit or deduction for foreign taxes paid for a period that will be "counted" in determining the taxpayer's social security benefits under a totalization agreement.

---

[4]The fact that Congress did not codify this provision in the United States Code has no impact on its authoritativeness or legal force. The best evidence of the laws of the United States is not the United States Code, but the Statutes at Large. Compare 1 U.S.C. sec. 112 ("[t]he United States Statutes at Large shall be legal evidence of laws") with 1 U.S.C. sec. 204(a) (the United States Code is "prima facie" evidence of the laws of the United States). See, e.g., U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 448 (1993) ("Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, it is the Statutes at Large that provides the 'legal evidence of laws[.]'") (quoting 1 U.S.C. sec. 112); Smith v. Commissioner, 114 T.C. 489, 491 (2000), aff'd, 275 F.3d 912 (10th Cir. 2001).

While disagreeing about the proper interpretation of this statute, the parties agree about its syntactic structure. The clause beginning "which is covered" must modify "period of employment or self-employment," because "which is" cannot modify the plural word "taxes." Further, the phrase "in accordance with the terms of * * * [a totalization] agreement" must modify "taxes paid" at the beginning of the sentence, even though such a phrase would generally be deemed to modify the closest noun. That must be so because if "taxes paid" were not modified in this way, SSA section 317(b)(4) would bar a credit or deduction for all taxes paid to a foreign country--including ordinary income taxes--for a period in which a U.S. citizen was covered by a foreign social security system. The parties agree, and the Court concurs, that Congress did not intend to bar a credit for ordinary income taxes.

In this case, petitioners paid CSG and CRDS to France with respect to a period of employment (2008-09) that was covered under the French social security system. The focus of the parties' interpretative dispute is whether petitioners paid these taxes "in accordance with" the terms of the Totalization Agreement. If so, SSA section 317(b)(4) denies a credit for these taxes "[n]otwithstanding any other provision of law." It is to that question that we now turn.

III.    "In Accordance With" the Terms of a Totalization Agreement

When construing a statute, a court's "analysis begins 'with the language of the statute'" and, "where the statutory language provides a clear answer, it ends there as well." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) (quoting Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992)). In Erlich v. United States, 104 Fed. Cl. 12 (2012), the U. S. Court of Federal Claims issued what appears to be the only judicial opinion that has addressed the interpretation of SSA section 317(b)(4). The court in Erlich concluded that the phrase "in accordance with" as used in that section has a readily discernible plain meaning. We agree with that conclusion.

In Erlich, the question was whether a U.S. citizen could claim a foreign tax credit for taxes paid to France, including CSG and CRDS. The taxpayer partici- pated in the French social security system during the relevant years, and the Government argued, as it does here, that SSA section 317(b)(4) precluded a credit. The court determined that "in accordance with" means "in agreement with" or "in conformity with," finding "no reason to believe that in Section 317(b)(4) Congress used the phrase" to imply anything other than its plain meaning. Erlich, 104 Fed. Cl. at 16. The court ruled that taxes are paid "in accordance with" the terms of a

totalization agreement when "this payment is consistent with the obligation of the taxpayer under the agreement." Id. at 17.

Generally speaking, international agreements impose obligations on contracting states, not on taxpayers or citizens. But we agree that the court's interpretation of "in accordance with" in Erlich makes perfect sense in the context of SSA section 317(b)(4). Where a totalization agreement is in effect, a U.S. citizen participates during a given year in only one country's social security system, namely, the system of the country in which he is employed. For that year, his "obligation" is to pay exclusively to that country whatever taxes are covered by the agreement. Thus, if particular foreign taxes are covered by, or within the scope of, a totalization agreement, the payment of those taxes to the foreign country is "consistent with the obligation of the taxpayer under the agreement," Erlich, 104 Fed. Cl. at 17, and the taxes are thus paid "in accordance with" the agreement.[5]

---

[5]For example, the French income tax meets all the criteria under SSA section 317(b)(4) to have a credit precluded, except that the income tax is not covered by, or within the scope of, the Totalization Agreement. Thus, petitioners' payments of French income tax were not made "in accordance with" the Totalization Agreement and SSA section 317(b)(4) does not bar a credit for these tax payments.

In Erlich, the court's conclusion that "in accordance with" means "consistent with the obligation of the taxpayer under" a totalization agreement was sufficient to resolve the summary judgment issue. That is because the parties had assumed, for purposes of summary judgment, that CSG and CRDS are "social security taxes" covered by the Totalization Agreement. See 104 Fed. Cl. at 13 n.1. Far from so stipulating, petitioners here vigorously dispute that proposition. The instant case thus requires us to decide a question that Erlich had no occasion to address, namely, whether CSG and CRDS are covered by, or within the scope of, the U.S.-France Totalization Agreement.

A.    Taxes Covered by the Totalization Agreement

When interpreting a treaty or other international agreement, we begin with its text. Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988). A treaty is to be interpreted in accordance with the ordinary meaning of its terms, consistently with their context and the agreement's object and purpose. Sanchez-Llamas v. Oregon, 548 U.S. 331, 346 (quoting 1 Restatement (Third) of Foreign Relations Law of the United States sec. 325(1) (1986)). Treaties are contracts between sovereigns and, as such, should be construed to give effect to the signatories' intent. United States v. Stuart, 489 U.S. 353, 365-366 (1989). Because treaties are construed more liberally than private agreements, we may

ascertain their meaning by looking beyond the written words to the history of the treaty, the parties' negotiations, and the practical construction they have adopted. Air France v. Saks, 470 U.S. 392, 396 (1985); see Estate of Silver v. Commissioner, 120 T.C. 430, 434 (2003); N.W. Life Assurance Co. of Can. v. Commissioner, 107 T.C. 363, 378-379 (1996).

Article 2 of the Totalization Agreement defines the laws of each country that are within its scope. As regards the United States, the "applicable laws" for purposes of the Agreement are specified provisions of the Social Security Act and the Internal Revenue Code. As regards France, the "applicable laws" are defined in article 2(1)(b) to include the following:

> i. laws establishing the administrative organization of social security programs;
>
> ii. laws establishing the social insurance system for nonagricultural employees and laws establishing the social insurance system for agricultural employees;
>
> iii. laws on prevention and compensation of occupational accidents and illnesses; laws on nonoccupational accident insurance and insurance against occupational accidents and illnesses for self-employed persons in agricultural occupations;
>
> iv. laws on family benefits;
>
> v. laws concerning special social security systems to the extent they relate to the risks or benefits covered by the laws enumerated in the preceding clauses, but excluding the special system for civil servants;

vi.  the law on the system for seamen;

vii.  laws concerning sickness and maternity insurance for nonagricultural self-employed workers and laws concerning sickness and maternity insurance for agricultural self-employed workers; [and]

viii.  laws concerning old-age allowances and old-age insurance for nonagricultural self-employed workers, laws concerning old-age and invalidity insurance for clergymen and members of religious orders, laws concerning old-age and invalidity insurance for attorneys, and laws concerning old-age insurance for agricultural self-employed workers.

The French taxes at issue here, CSG and CRDS, were enacted after the effective date of the Totalization Agreement and thus are not specifically listed among the eight enumerated categories of laws.  However, article 2(3) further provides:

> This Agreement shall also apply to legislation which amends or supplements the laws specified in paragraph 1; however, it shall apply to future legislation of a Contracting State which creates new categories of beneficiaries only if the Competent Authority of that Contracting State does not notify the Competent Authority of the other Contracting State in writing within three months of the date of the official publication of the new legislation that no such extension of the Agreement is intended.

The parties agree that the text following "however" has no application here because CSG and CRDS do not create any new category of beneficiary.  Thus, the question we must answer is whether CSG and CRDS "amend or supplement" the specified French laws.

Article 1(10) of the Totalization Agreement, the definitional provision, provides that "[a]ny term not defined in this Article shall have the meaning assigned to it in the laws which are being applied." Neither "amend" nor "supplement" is a defined term in article 1. As a result, we apply U.S. legal concepts in determining whether CSG and CRDS "amend or supplement" the laws in question.

Respondent contends that "[t]he Court need look no further than the plain language of the Totalization Agreement to reach the conclusion that the CSG and CRDS are covered taxes." In respondent's view, the terms "amend" and "supplement" have a plain meaning that is readily ascertainable by using dictionaries and related tools. Petitioners have not provided the Court with a definition of either term that directly supports their position. Rather, they contend that article 2(3) cannot have a "plain meaning" because the Totalization Agreement has been "interpreted by the French authorities to lead to precisely the opposite result" of that urged by respondent. In effect, petitioners contend that later-enacted laws "amend or supplement" the specified laws only if the new laws "accord with [the] traditional definition of social security taxes."

On this point we agree with respondent. The words "amend" and "supplement" are terms of potentially broad scope in U.S. jurisprudence. Had the signa-

tories desired to limit covered taxes in the manner petitioners suggest, the signatories could have so provided in article 2(3) or by comparable provision in the definitional article. They did not do so. Rather, they defined "applicable taxes" for purposes of the Totalization Agreement to include "legislation that amends or supplements" the eight enumerated categories of French laws. It is certainly possible for a new law to amend or to supplement the specified laws without itself being a "traditional * * * social security tax[]." The fact that French officials at times have taken the position that CSG and CRDS are not covered by the Totalization Agreement is not dispositive, especially because the terms "supplement" and "amend" must here be interpreted according to U.S., rather than French, legal principles.

The verb "amend" is defined to mean "formally alter (a statute, constitution, motion, etc.) by striking out, inserting, or substituting words." Black's Law Dictionary 94 (9th ed. 2009). The verb "supplement" means "provide or form a supplement," and the noun "supplement" is defined to mean "[s]omething added to complete a thing, make up for a deficiency, or extend or strengthen the whole." American Heritage Dictionary 1739 (4th ed. 2000); see Webster's New World Dictionary 1430 (2d coll. ed. 1980) (defining the verb "supplement" to mean "provide a supplement to; add to, esp. to make up for a lack or deficiency"); Web-

ster's New World College Dictionary 1438 (4th ed. 2010) (same); Black's Law Dictionary 1577 (defining "supplemental" to mean "[s]upplying something additional; adding what is lacking").

We will adopt the ordinary, contemporary understanding of these words for purposes of our analysis.[6] We must accordingly determine whether CSG and CRDS amended or supplemented the specified French social security laws by (1) formally altering one or more of these laws by striking out, inserting, or substituting words; (2) adding something to make up for a lack or deficiency in one or more of these laws; or (3) adding something to extend or strengthen the French social security system as a whole.

B.      The French Social Security System, CSG, and CRDS

The following summary of French law derives from the affidavits of the parties' expert witnesses, the parties' memoranda, and the accompanying primary sources. Under French law, social security is based on the principle of national

---

[6]Of the 24 totalization agreements currently in force between the United States and other countries, 18 contain terms similar to the "amends or supplements" clause in article 2(3). France, in its totalization agreements with other countries, generally uses the words "amends" and "extends" for the same purpose. See Agreement on Social Security, Fr.-Ind., July 30, 2008, art. 2(2). We have been unable to find any instance in U.S. law where "amend or supplement" is treated as a verbal collocation with an unusual or unique significance or as a specialized term of art. We accordingly look to the plain meaning of each verb separately in its ordinary sense.

solidarity. The social security system is designed to provide protection for French workers, French residents, and their families against risks of any nature likely to reduce or limit their earning capacity. The eight categories of laws enumerated in article 2(1)(b) of the Totalization Agreement constitute the bulk of the French social security system. The benefits provided by these laws cover illness (work-related or not), occupational accidents, maternity and paternity, increases in family costs, disability, old age, and death, with specialized coverage for particular industries and professions.

The French social security system is financed through national insurance contributions paid by employers and workers and through taxation and earmarked charges. Social security contributions are generally calculated on a percentage of the worker's gross income. Contributions are withheld at the source by employers and paid directly by self-employed individuals.

The legal retirement age in France varies from 52 to 62 depending on one's occupation. The retirement benefit received depends upon average annual earnings (25 highest earning years), the payment rate (between 27.5% and 50%), and the total period of insurance, which is calculated in calendar quarters. To receive the full payment rate (50%), a participant must have accumulated a total period of insurance of at least 160 calendar quarters.

France has a dedicated bureaucracy consisting of numerous public entities that coordinate the provision of social security benefits. These include the Central Agency for Financial Entities (ACOSS), a public agency charged with managing the cashflows of numerous social security funds. ACOSS monitors private entities responsible for the collection of social security contributions and family allowances (URSSAF) and also acts to ensure the uniform interpretation of the laws and regulations these entities apply.

The CSG law was enacted in December 1990 and is currently codified in the French Social Security Code (CSS), which includes most provisions governing social security benefits in France. See Code de la Sécurité Sociale, Articles L136-1 et. seq. CSG is assessed annually at a rate of 7.5% on most employment income; at a rate of 8.2% on income from property and financial investments (including capital gains and income from life annuities); and at a rate of 6.6% on income received in connection with retirement or disability. Approximately two-thirds of CSG assessed on employment income is a deductible expense for purposes of computing the French individual income tax. In 2012, CSG was extended to apply to capital gains from the sale of French real property by non-French residents.

CSG on employment income is withheld by the employer in the same manner as other social security taxes and appears on the employee's pay stub as a

social contribution. Employers remit CSG directly to URSSAF, the entities responsible for collection of French social security contributions generally. CSG is collected on passive income by withholding at the source with respect to French-source income and is otherwise reported on the individual's personal tax return.

Initially, all proceeds from CSG were allocated to the National Family Allowances Fund, which is directly linked to French laws on family benefits (one of the eight enumerated categories of laws in article 2(1)(b) of the Totalization Agreement). The CSG law was subsequently amended, directing a portion of CSG revenues into two other funds directly linked to the social security system (compulsory health schemes and the Old-Age Solidarity Fund). This amendment also directed a variable, but apparently small, portion of CSG into the National Solidarity Fund for Autonomy, which supports the elderly and disabled, and a fund dedicated to retirement of debt incurred by the French social security system, described more fully below.[7]

---

[7]Petitioners' expert did not opine on the percentage of CSG that goes into each specific fund. At oral argument, petitioner's counsel represented that the percentage varied from year to year, but that the amount allocated to the National Solidarity Fund for Autonomy and the social security debt reduction fund is not less than 0.1% "and it's not 50[%]. It's sort of a variable amount."

The CRDS law was enacted in January 1996 and is not codified. CRDS is assessed annually at a rate of 0.5% on the same base as CSG, expanded slightly to include certain categories of income that are otherwise exempt from tax (e.g., proceeds from the sale of art, jewelry, antiques, and collector's items). CRDS is withheld and collected in the same manner as CSG and is a nondeductible expense in computing the French individual income tax.

All CRDS proceeds, and a portion of CSG proceeds as mentioned above, go to the Caisse d'Amortissement de la Dette Sociale (Social Debt Redemption Fund or CADES). CADES is administered by a public body under the joint supervision of the Minister for Social Security and the Minister for the Economy and Finance. The primary purpose of CADES is to discharge debt incurred to fund French social security programs. Most or all of this debt was contracted by ACOSS, the public agency responsible for managing the cashflows of France's various social security funds. ACOSS incurred this debt to finance the deficits accumulated by the French social security system during 1994 and 1995 and to finance the system's predicted deficit for 1996.

CSG and CRDS do not create any new category of beneficiary under the French social security system. By paying these taxes, individuals do not become entitled to additional or increased benefits under any French social security law.

Neither CSG nor CRDS provides a "period of coverage" separate from or in addition to the "period of coverage" that an individual accrues by being employed in France and paying the French social security taxes he would otherwise pay. In effect, CSG and CRDS put into place a pair of tax increases that left the benefit structure the same as it was previously.

C.  Analysis

1.  Plain Meaning of Article 2(1)(b)

We agree with respondent that CSG and CRDS are covered by, or within the scope of, the Totalization Agreement because they "amend or supplement" the French social security laws specified in article 2(1)(b). CSG and CRDS are both administered by French social security officials. These taxes are collected in the same manner as French social security taxes. In the case of employees, these taxes are collected by URSSAF, the entities responsible for collecting French social security charges generally. The URSSAF entities are monitored by ACOSS, the public entity in charge of managing cashflows for France's social security funds. As a rule CSG and CRDS are imposed only on persons who otherwise participate in the French social security system. In 2001 the French Government amended the social security code to provide that CSG and CRDS are payable only by individuals who are covered by a compulsory French sickness insurance scheme.

See Code de la Sécurité Sociale, Article L136-1. The compulsory French sickness insurance scheme is one of the eight categories of social security laws enumerated in article 2(1)(b).[8]

These facts make it clear that CSG and CRDS are part of the French social security system in a practical sense. More specifically, these two taxes "amend or supplement" the laws that make up this system. CSG is codified in the CSS, which includes most provisions governing social security benefits in France. CSG thus "amends" the French social security laws by adding words to the relevant statute.

CSG and CRDS also "supplement" the French social security laws in two ways. Both taxes were enacted to address systemic funding shortfalls in the French social security system. The bulk of CSG revenues is directed into funds that directly support the payment of benefits under one or more social security laws enumerated in article 2(1)(b). The balance of CSG revenues, and all of CRDS revenues, is used to discharge debt incurred by ACOSS to fund social

---

[8]The general rule stated in the text is now subject to an exception, created by the 2012 amendment that made CSG and CRDS applicable to gains realized on the sale of French real property by non-French residents. Typically, non-French residents would not be covered by the compulsory French sickness insurance scheme and would not be participating (for that year anyway) in the French social security system.

security benefits. In ascertaining whether CSG and CRDS "supplement" French social security laws, we see no meaningful distinction between paying off debt incurred by French social security programs and paying money into those program funds directly. In either event, the new taxes "supplement" the specified French social security laws by "making up for a deficiency" in them or by "strengthening" them.

### 2. European Court of Justice Cases

The European Court of Justice (ECJ) has issued several rulings regarding the proper characterization of CSG and CRDS for purposes of European Union (EU) law. While not binding on us, the decisions of an international court are entitled to respectful consideration. See Sanchez-Llamas, 548 U.S. at 333.

In two cases decided in February 2000, the ECJ was called upon to decide whether France, consistently with EU regulations, could impose CSG and CRDS on French residents who worked in, and paid social security taxes to, another EU member state. See Case C-169/98, Comm'n v. France, 2000 E.C.R. I-1052; Case C-34/98, Comm'n v. France, 2000 E.C.R. I-1028. In order to protect constitutional freedoms to move and work in any member state, EU regulations provide that citizens of one state cannot be required to pay social security contributions to two different states for the same period of work. See Regulation

No. 1408/71, 1971 O.J. (L 149) 2.  Generally, social contributions may be imposed only by the member state in which the individual is employed.

The EU Commission commenced an investigation and determined that, by levying CSG and CRDS on the wages of French residents who worked in another member state, France violated Regulation No. 1408/71 by imposing social charges on income that had already borne social charges in that other state.  The French authorities disagreed, contending (among other things) that CSG and CRDS are not social charges because the individuals subject to these taxes do not receive any additional benefits by virtue of paying these taxes.  The cases were brought to the ECJ for resolution of this dispute.

The ECJ ruled against France, holding that CSG and CRDS are social charges under EU law.  The Court ruled that "[t]he fact that a levy is categorized as a tax under national legislation does not mean that, as regards Regulation No. 1408/71, that same levy cannot be regarded as falling within the scope of that regulation and caught by the prohibition against overlapping legislation."  Case C-34/98, 2000 E.C.R. at I-1041.  According to the ECJ, the dispositive question is whether there is a direct and sufficiently relevant link "between the provision in question and the legislation governing the branches of social security."  The Court

concluded that CSG and CRDS each had a sufficiently direct link to the French social security system.

As regards CSG, the ECJ determined that this tax "is allocated specifically and directly to financing social security in France." Case C-169/98, 2000 E.C.R. at I-1066. The link between CSG and the French social security system, the court found, "is also clearly revealed by the fact that, as the French Government itself asserts, the levy replaces in part social security contributions which were a heavy burden on low and medium levels of pay, and means that an increase in existing contributions can be avoided." Ibid. As regards CRDS, the court determined that this tax "is in part designed to discharge a debt of the social security scheme caused by the financing of benefits paid out in the past." Case C-34/98, 2000 E.C.R. at I.1042-1043. These links to the French social security system, the court concluded, were sufficient to characterize both CSG and CRDS as social charges.[9]

_____

[9]Petitioners note that, under article 2(4), "applicable laws" for purposes of the Totalization Agreement do not include EU regulations. That is correct, but immaterial. The question is whether CSG and CRDS are "applicable laws" by virtue of "amending or supplementing" the French social security system. Nothing in the Totalization Agreement prevents us from considering ECJ decisions persuasive as to the proper characterization of CSG and CRDS, and we will grant these opinions respectful consideration. Petitioners also note that the ECJ, in finding a sufficient "link," relied in part on "the specific allocation of the CSG and CRDS to fund the French social security system." According to petitioners, "[t]he concept of specific allocation of tax receipts to a social security system * * * is not

(continued...)

The ECJ concluded that CSG and CRDS are social charges because they are directly linked to the French social security system. The purpose of these taxes was to finance the French social security system, and the proceeds of these taxes fund the payment of social security benefits or retire debt incurred to pay social security benefits. While we are not bound by ECJ opinions, its conclusion that CSG and CRDS are social charges, and its reasoning in support of that conclusion, directly support our determination that CSG and CRDS "amend or supplement" the French social security laws.

D.    Petitioners' Arguments

Petitioners agree that CSG "was a new tax codified in the French Social Security Code"; that CSG and CRDS were "expressly imposed upon participants in the French Social Security program"; and that these taxes "funded (to some degree) the French Social Security Programs." Petitioners advance three main arguments as to why CSG and CRDS nevertheless are not covered by the Totalization Agreement. We address these arguments in turn.

---

[9](...continued)
the criterion at stake here." We disagree. The specific allocation of taxes to fund the French social security system is one highly relevant factor in determining whether CSG and CRDS "amend or supplement" the specified social security laws.

1.    Tax Base

Petitioners contend that the tax base on which CSG and CRDS are imposed shows that they are not "social security taxes within the definition of the French Totalization Agreement."  Petitioners note that CSG and CRDS "apply to unearned income."  In 2012, moreover, these taxes were extended to apply to gains realized by nonresidents of France on the sale of French real property.  Under the Totalization Agreement and comparable EU regulations, France is not supposed to impose social security taxes on U.S. or EU citizens unless they are employed in France.  Thus, by extending CSG and CRDS to sales of property by nonresidents, France has expressed, according to petitioners, its understanding that CSG and CRDS are not social security taxes.

We reject these arguments.  First, the relevant question under the Totalization Agreement is not whether CSG and CRDS are "social security taxes," but whether they "amend or supplement" the specified social security laws.  As noted supra p. 20, a new law can "amend or supplement" the enumerated laws without necessarily imposing a social security tax in its own right.

Second, the fact that a tax is imposed on unearned income, including income from sales of property, has little if any bearing on whether it is a "social security tax" or on whether it "amends or supplements" social security laws.  A

sovereign state is free to impose a social security tax on whatever tax base it thinks proper.

Third, we give little weight to the 2012 amendment. In assessing the character of the taxes at issue, we will not let the tail wag the dog. The revenue derived by extending CSG and CRDS to sales of real property by nonresidents appears to be trivial when compared with the revenue raised by these taxes generally. If substantially all the proceeds of a tax are consistent with its character as a social charge, a trivial anomaly is the exception that proves the rule. Moreover, the tax years before the Court are 2008 and 2009. In assessing the character of CSG and CRDS for the years at issue, we decline to give weight to postenacted legislation. Finally, the thrust of petitioners' argument is that the 2012 amendment shows that the French Government regards CSG and CRDS as income taxes and not social security taxes. As noted above, the ECJ has rejected France's position and ruled that these taxes are social charges under EU law. See supra pp. 28-31. And as we discuss infra pp. 41-47, France's treatment of these levies as income taxes for purposes of French domestic law does not control our decision as to whether they "amend or supplement" the laws specified in the Totalization Agreement.

### 2. "Period of Coverage" or "Benefit"

SSA section 317(b) provides that foreign taxes paid "in accordance with" the terms of a totalization agreement shall not be creditable "[n]otwithstanding any other provision of law." We have determined that petitioners paid CSG and CRDS "in accordance with" the Totalization Agreement and hence that no credit is available. Petitioners contend that we must go further. According to petitioners, SSA section 317(b)(4) precludes a credit only if the taxpayer receives a "period of coverage" for the specific foreign tax paid. Since a totalization agreement is "designed to totalize 'periods of coverage,' the clear implication of the SSA § 317(b)(4) disallowance," according to petitioners, "is that it applies only when the payment of tax gives rise to a period of coverage."

Petitioners offer no textual support for this argument, and we find no such "implication" in the statute or its legislative history. Nothing in SSA section 317(b)(4) links the preclusion of a credit to an individual's receiving a "period of coverage." Petitioners cite the definition of "period of coverage" in article 1(6) of the Totalization Agreement and try to link the word "laws" in that definition to the "laws" covered under article 2, which lists the applicable U.S. and French social security laws. This argument is flawed. The fact that a "period of coverage" can be provided only by laws specified in article 2 does not mean that every law speci-

fied in article 2 must provide the taxpayer with a distinct "period of coverage." Petitioners similarly try to establish a link with articles 12 and 13, which coordinate periods of coverage. But these articles likewise do not require that each tax specified in article 2 provide the taxpayer with a distinct "period of coverage." They simply coordinate benefits when the requisite "periods of coverage" exist.

In any event, the provision that determines the allowability of a credit here is SSA section 317(b)(4), and nothing in that statute supports petitioners' argument. Petitioners would have us ignore the statute's plain meaning and interpret "in accordance with"--in the absence of any statutory language or legislative history pointing us in that direction--to mean "in a manner that affords the taxpayer a period of coverage under a foreign social security law." Like the court in Erlich, we decline to give "in accordance with" such an idiosyncratic meaning. If Congress had intended to limit credit preclusion to situations where the taxpayer obtained a distinct period of coverage under the foreign social security system by paying the tax at issue, Congress could easily have drafted the statute to say this. The legislative history suggests no such intent, because it refers to the desirability of coordinating the U.S. and foreign "social security systems," not to the desirability of ensuring that U.S. taxpayers derive a benefit from paying

a particular foreign tax.  See H.R. Rept. No. 95-702 (Part 1), supra at 10-11, 1997

U.S.C.C.A.N. at 4167-4168.[10]

Besides lacking textual support, petitioners' argument has little to recom-

mend it in common sense or policy terms.  Petitioners paid various social security

taxes to France during 2008-09 and thereby accrued a French "period of coverage"

of eight calendar quarters.  Obviously, petitioners could not possibly accrue an

additional "period of coverage" for that two-year period.  In both the United States

and France, social security benefits are based on the period of employment during

---

[10]The Court of Federal Claims' opinion in Erlich, by analogy, supports
rejection of petitioners' argument here.  The taxpayer in Erlich worked for a non-
U.S. employer in France.  Because he was not liable for U.S. social security tax,
there was no risk of double taxation.  On the facts of that case, therefore, the
Totalization Agreement did not operate to effect Congress' first purpose in
providing for such agreements--the elimination of double taxation--and the
taxpayer argued that SSA section 317(b)(4) should not preclude a credit in such
circumstances.  The court in Erlich rejected this argument, holding in effect that
"in accordance with" does not mean "in a manner that accomplishes a specific
purpose of."  See Erlich, 104 Fed. Cl. at 17.  Here, petitioners focus on Congress'
second purpose in providing for totalization agreements--the coordination of
benefits.  Because CSG and CRDS do not provide "periods of coverage,"
petitioners argue that there are no distinct periods of coverage to coordinate; that
the Totalization Agreement therefore does not operate to effect Congress' second
purpose in providing for such agreements; and that SSA section 317(b)(4) should
not preclude a credit in these circumstances.  Like the court in Erlich, we decline
to hold that "in accordance with" means "in a manner that accomplishes a specific
purpose of."  It is immaterial whether one of Congress' stated purposes is fully
realized on a particular set of facts.  Our focus is on the language of the statute,
and we will not override its plain meaning.

which a person pays social security taxes, not on the total amount of taxes paid. If

France had amended its social security laws to increase the tax rate, and if

petitioners had paid that increased tax during 2008-09, they would have derived

no benefit in terms of increased entitlement and would have accrued no "period of

coverage" distinct from the two-year period of coverage they were already

accruing. But that amendment would indisputably "amend or supplement" the

French social security laws specified in article 2(1)(b). The same principle applies

here: There is an additional tax but no additional benefit. In determining whether

a new law "amends or supplements" the French social security laws, it simply does

not matter whether taxpayers derive a benefit by paying the additional tax.[11]

3.   Postratification Understandings of the Signatories

Because a treaty is an agreement among sovereign powers, "the

postratification understanding" of the signatory nations may assist in interpreting

it. Medellín v. Texas, 552 U.S. 491, 507 (2008) (quoting Zicherman v. Korean Air

---

[11]In its February 2000 opinion, the ECJ rejected France's argument that CSG and CRDS are not social charges because the individuals who pay these taxes do not thereby accrue any additional benefits. The ECJ noted that CSG and CRDS effected a tax increase on upper-income people, without any correlative increase in benefits, to avoid burdening lower and middle-income people. See Case C-169/98, 2000 E.C.R. at I-1066 ("[A]s the French Government itself asserts, the [CSG] levy replaces in part social security contributions which were a heavy burden on low and medium levels of pay, and means that an increase in existing contributions can be avoided.").

Lines Co., 516 U.S. 217, 226 (1996)). The parties' conduct may evidence their understanding of the agreement they signed, and their postratification practice may thus shed light on the treaty's proper interpretation. See Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 259 (1984). To determine postratification practice, we look to the actual practice of the political arms of both nations.

### a.     Position of the United States

"Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty," El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 168 (1999), but respect is not the same as uncritical acceptance, see N.W. Life Assurance Co. of Can., 107 T.C. at 380. Indeed, the Supreme Court has noted that "courts interpret treaties for themselves," so that the construction adopted by Government agencies is not necessarily conclusive. Id. at 380-381 (quoting Kolovrat v. Oregon, 366 U.S. 187, 194 (1961)). The deference afforded depends upon the degree to which the interpretation proffered by the Government is reasonable and consistent with what appear to be the circumstances surrounding the convention. Id. at 381.

The U.S. Government has consistently regarded CSG and CRDS as covered by the Totalization Agreement. In February 1997 the U.S. Embassy in Paris wrote

the French Minister of Social Affairs and Employment to complain about France's application of CSG and CRDS to so-called detached U.S. workers in France. Under the "detached worker" rule, an individual sent from one nation to another to work for a relatively short time--up to five years under the Totalization Agreement, article 6(1)--may elect to be covered exclusively by the social security system of the sending nation. Thus, a U.S. detached worker in France is typically exempt from French social charges.

In the February 1997 letter, the United States argued that the French Government could not properly levy CSG or CRDS against detached U.S. workers who, under the Totalization Agreement, are excluded from paying French social security taxes. The letter took the position that CSG and CRDS are covered by the Totalization Agreement and that the application of these taxes to employees temporarily in France "constitutes a pure and simple violation" of that agreement. Letter from Donald K. Bandler, Embassy of the United States of America, to Jacques Barrot, Minister of Social Affairs and Employment, French Government (February 20, 1997).

Respondent has also provided the Court with a declaration from Vance Teel, the Acting Associate Commissioner for the Office of International Programs, Social Security Administration. The Office of International Programs represents

the agency in negotiating international social security agreements, formulating policies concerning program operations outside the United States, and issuing certificates of coverage for U.S. detached workers.  Mr. Teel declared:  "Based on information available to me and to the best of my understanding and belief, * * * [the Social Security Administration] considers the French * * * (CSG) and * ** (CRDS) to be covered by the * * * [Totalization Agreement]."

The Embassy letter and the Teel declaration clearly state a position consistent with that adopted by the IRS in this litigation.  However, neither document explains the basis for the Government's position in detail.  Thus, while we find these statements helpful, we do not regard them as entitled to "great weight."  Cf. Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 184-185 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").  We accept these documents as enunciating the postratification understanding of the United States concerning the status of CSG and CRDS as taxes covered by the Totalization Agreement.

> b.      Position of the French Government

The Government of France does not appear to have taken a definitive position as to whether CSG and CRDS are covered by the Totalization Agreement.

Petitioners' and respondent's experts concur that there is no French judicial or administrative precedent that explicitly addresses this question. Petitioners cite certain court cases, governmental materials, and administrative practice as evidence of France's postratification understanding. But these materials are susceptible to different inferences; they do not yield an unambiguous position as to France's interpretation of the Totalization Agreement. In any event, while we may give weight to the interpretation adopted by a treaty partner, we are not bound by it. See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("PERTAMINA"), 313 F.3d 70, 92 (2d Cir. 2002); United States v. A.L. Burbank & Co., 525 F.2d 9, 15 (2d Cir. 1975) (holding that Canadian interpretation of tax treaty between United States and Canada is not determinative in U.S. courts); cf. Iceland Steamship Co. Eimskip v. U.S. Dep't of the Army, 201 F.3d 451, 458 (D.C. Cir. 2000) (deference to an agency's determination of a treaty term is eroded "where an agency and another country disagree on the meaning of a treaty").

Respondent contends that two agencies of the French Government--ACOSS and URSSAF, the agencies tasked with collecting social security taxes and distributing social security proceeds--have recognized that CSG and CRDS are covered by the Totalization Agreement. Some background is necessary to

understand respondent's position. Before 2000, France levied CSG and CRDS against U.S. detached workers. (This was the subject of the U.S. Embassy's protest letter. See supra pp. 39-40). If CSG and CRDS were covered by the Totalization Agreement, France should not have subjected detached workers to these taxes. The French Government changed its position in 2000, after the ECJ issued its opinions holding that CSG and CRDS are social charges. See supra pp. 28-31. France that year amended its social security code to limit the application of CSG and CRDS to individuals who are covered by the compulsory French sickness insurance scheme, i.e., to French residents who are not detached workers.

Respondent bases his argument on two letters, one from ACOSS and one from URSSAF. According to respondent, these letters evidence the French Government's understanding that CSG and CRDS are covered by the Totalization Agreement. Petitioners draw a different inference from these letters--namely, that detached workers are exempt from CSG and CRDS, not by virtue of the Totalization Agreement, but by virtue of the 2000 domestic law change. On balance, we do not find these letters to be helpful in discerning the French Government's position one way or the other.

Petitioners cite several French judicial decisions that have characterized CSG and CRDS as income taxes--"taxes of any kind"--as opposed to social

security contributions, for purposes of French domestic law. See Conseil consitutionnel (Constitutional Court), 2000-442 DC (Decembre 2000); Conseil consitutionnel, 90-285 DC (December 1990). In France, the legislative procedures for enacting income taxes and social security contributions differ. In these cases, the French courts were asked to decide whether CSG and CRDS were income taxes or social charges for the purpose of determining whether the Government had followed proper procedures when enacting the laws.

The courts concluded that CSG and CRDS are income taxes because neither gives rise to any social benefit, and hence that CSG and CRDS were properly enacted under the legislative procedure applicable to "taxes of any kind." This holding as to domestic French law does not control our determination whether CSG and CRDS "amend or supplement" the French laws specified in the Totalization Agreement. Indeed, the ECJ in 2000 held that CSG and CRDS are "social charges" under EU law notwithstanding their characterization as "taxes" for French domestic purposes. See Case C-34/98, 2000 E.C.R. at I-1041 ("The fact that a levy is categorized as a tax under national legislation does not mean that, as regards Regulation No. 1408/71, that same levy cannot be regarded as * * * [a social charge] within the scope of that regulation[.]").

Finally, petitioners cite France's position concerning the status of CSG and CRDS under the U.S.-France income tax treaty. The French Government has issued several Statements of Practice informing French taxpayers that CSG and CRDS are covered by the income tax treaty and hence are creditable taxes. That being so, petitioners contend that CSG and CRDS cannot simultaneously be covered by the Totalization Agreement.

We reject this argument. France's view that CSG and CRDS are creditable taxes reflects its position that these levies are "income taxes" under domestic French law. As noted above, that position does not control our determination whether CSG and CRDS "amend or supplement" the specified French laws within the meaning of the Totalization Agreement.

In any event, even if CSG and CRDS are within the scope of the income tax treaty, they can simultaneously be covered by the Totalization Agreement. As noted earlier, it is common ground that CSG and CRDS meet the general criteria for creditability under section 901. But petitioners may claim a credit under the treaty only "[i]n accordance with the provisions and subject to the limitations of the law of the United States." Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, U.S.-Fr., art. 24(1)(a), Aug. 31, 1994 (Income Tax Treaty), Tax Treaties

(CCH) para. 3001.25 at 75,029. Petitioners are not allowed a credit, either under section 901 or under the Income Tax Treaty, if SSA section 317(b)(4) precludes such a credit. The question is not whether CSG and CRDS are covered by the Income Tax Treaty, but whether SSA section 317(b)(4) bars a credit "notwithstanding any other provision of law."[12]

In sum, we find that the postratification understanding of the French Government, to the extent discernible, provides no meaningful support for petitioners' position. Where, as here, the signatories take opposite stances on a question of treaty interpretation, the foreign partner's view does not have controlling force. A.L. Burbank & Co., 525 F.2d at 15. Moreover, the French Government does not appear to have engaged in an independent analysis, as a matter of treaty

---

[12]Petitioners err in relying on the Department of the Treasury's Technical Explanation of the Income Tax Treaty, which states that the treaty "does not apply to social security taxes." Department of the Treasury Technical Explanation of the Convention for the Avoidance of Double Taxation With Respect to Taxes on Income, U.S.-Fr., Aug. 31, 1994, Tax Treaties (CCH) para. 3060, at 75, 253. If CSG and CRDS are covered by the Income Tax Treaty, petitioners argue, this passage suggests that they cannot be "social security taxes" and hence are not covered by the Totalization Agreement. We reject this argument for two reasons. First, the Department of the Treasury in this passage identifies the U.S. taxes, not the French taxes, that are subject to the Income Tax Treaty. In so doing, it simply tracks treaty language that defines covered U.S. taxes as "the Federal income taxes imposed by the Internal Revenue Code (but excluding social security taxes)." Income Tax Treaty, art. 2(1)(a)(i). Second, the central question in this case is not whether CSG and CRDS are "social security taxes," but whether they "amend or supplement" the French laws specified in the Totalization Agreement.

interpretation, as to whether CSG and CRDS "amend or supplement"--the French text reads "modifiant ou complétant"--the laws specified in the Totalization Agreement. Rather, France's position regarding the Agreement appears to be a corollary of its position that these taxes were properly enacted as "income taxes" under French domestic law.

French courts have recently held that CSG can be characterized as a social charge for purposes of the EU Regulations while simultaneously being characterized as an income tax for French domestic purposes. See Cour de cassation (Supreme Court for Judicial Matters), No. 11-10762 (May 31, 2012), Bulletin 2012, V, n° 166 ("[W]hile the CSG falls within the category of "taxes of any kind" within the meaning * * * of the Constitution * * *, this contribution also has the nature of a social security contribution within the meaning * * * of the EU Regulation [1408/71] by virtue of its exclusive allocation to the funding of several social security regimes."). The French courts thus see no inconsistency in treating CSG and CRDS as income taxes for domestic purposes but as social charges for EU purposes. We similarly see no inconsistency in respecting the character of these levies as income taxes for French domestic purposes while holding that they nevertheless "amend or supplement" the French social security laws within the meaning of the Totalization Agreement.

IV.    Conclusion

SSA section 317(b)(4) disallows a credit for taxes paid to France "in accordance with" the U.S.-France Totalization Agreement.  Petitioners paid CSG and CRDS "in accordance with" that agreement because those taxes "amend or supplement" the French social security laws enumerated in the agreement.  Petitioners' claimed credits for these taxes are thus barred.  We will therefore grant respondent's motion for summary judgment and deny petitioners' motion.

An appropriate order will be issued, and decision will be entered under Rule 155.